Vito J. Titone, J.
These are two article 78 proceedings. In the first, the petitioners are a student at Staten Island Com *96 munity College and Ms father, and in the second, they are four taxpayer-students at Richmond College. Both groups of petitioners seek an order directing these schools to adopt and enforce regulations proMMting derogatory and blasphemous attacks on religion in student publications.
The Dolphin is a newspaper written and published by the students of Staten Island Community College; it recently contained an article entitled “ The Catholic Church-Cancer of Society ’ ’. As can be imagined from the title, it was a virulent attack on the Roman Catholic Church. The Richmond Times is a newspaper written and published by the students of Richmond College; it .recently contained an article which vilified Jesus Christ in a most shocking manner.
It is the publication of these articles which has motivated the instant proceedings. Since the legal questions are the same in each, the court hereby consolidates them on its own motion.
At the outset, respondents’ contention that article 78 is inappropriate is rejected (Matter of Engel v. Vitale, 18 Misc 2d 659, 11 A D 2d 340, 10 N Y 2d 174, revd. 370 U. S. 421). The court is also unimpressed with the assertion that some rather vaguely defined ‘ ‘ administrative remedies ’ ’ should have been exhausted; they seem inappropriate in any event.
The basic facts are not in dispute. Both schools are tax-supported public institutions. Both publications display the official seal of the City University of New York; both have faculty members as advisors; both are funded in part by a mandatory fee collected from the students; both have office space and telephones on the campus; the official student handbook at both institutions promotes the publications.
The First Amendment to the United States Constitution declares that “ Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ’ ’. This mandate has erected an unbreachable wall separating church and State, and it requires the strictest neutrality on the part of Federal, State and local governments in their dealings with and attitudes toward religion . (Epperson v. Arkansas, 393 U. S. 97; Abington Schools Dist. v. Schempp, 374 U. S. 203; Engel v. Vitale, 370 U. S. 421; Zorach v. Clauson, 343 U. S. 306; McCollum v. Board of Educ., 333 U. S. 203; Everson v. Board of Educ., 330 U. S. 1.)
The cases in this area usually involve a claim that government has favored or assisted religion in a proscribed manner, which of course it cannot do. But it is equally clear that government may not disparage, attack or show hostility toward religion. “ State power is no more to be used so as to handicap religions *97 than it is to favor them.” (Everson v. Board of Educ., supra, p. 18.) The rule was also set forth in Abington School Dist. v. Schempp (supra, p. 225); “ We agree of course that the State may not establish a 1 religion of secularism ’ in the sense of affirmatively opposing or showing hostility to religion, thus ‘ preferring those who believe in no religion over those who do believe 5 ”. See, also, McCollum v. Board of Educ. (333 U. S. 203, 211-212), where the court said: “ A manifestation of such hostility [toward religion] would be at war with our national tradition as embodied in the First Amendment’s guaranty of the free exercise of religion.”
Engel v. Vitale (370 U. S. 421, 422) involved a constitutional attack on the practice of a New York public school district in commencing the school day by reciting the following prayer composed by the State Board of Regents: “ Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country.” The establishment clause was held violated, although no child was required to recite, the utterance was nondenominational, and only a bare fraction of a teacher’s time was required to lead the prayer. Nevertheless, this practice was condemned because “ it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government. ’ ’ (p. 425.)
Relating the rules of the cases discussed to the one at bar, the court finds that property, facilities and employees of the State and City of New York were used for an attack on religion and, further, that this violates the absolute neutrality required of these governments by the First and Fourteenth Amendments. The instant ease is a more serious violation than the one in Engel v. Vitale, where a 10-second recitation of an innocuous prayer requiring a scintilla utilization of public facilities was held to violate the establishment clause. Here, the use of public facilities is comparatively extensive, and an employee of the government (the faculty-advisor) presumably devotes far more time to his advisory duties than the few seconds used by a teacher in reciting the Engel prayer. When these facts are added to the others set forth at the beginning of this opinion, it is seen that the imprimatur of the State is far more pronounced herein than in Engel v. Vitale.
This case is distinguishable from Zorach v. Clauson (343 U. S. 306), where the New York practice of releasing students during school hours for religious instruction at nonpublic places was upheld. The court there found that (pp. 308-309): “ This 4 released time ’ program involves neither religious instruction *98 in public school classrooms nor the expenditure of public funds. All costs * * * are paid by the religious organizations.” Here, school facilities are used and public funds are expended.
The respondents’ contention in their main brief that the schools ’ connection with these publications is ‘ ‘ remote ’ ’ is untenable in view of the foregoing, and in view of the fact that not even the ‘1 slightest breach ’ ’ of the wall of separation can be tolerated. (Everson v. Board of Educ., 330 U. S. 1, 18, supra; see, also, Engel v. Vitale, 370 U. S. 421, 436, supra and Abington School Dists. v. Schempp, 374 U. S. 203, 225.)
The respondents urge that to prevent publication of articles such as these would infringe upon the students’ freedom of speech, and they cite many decisions in this area of constitutional law. This is simply not the case. The students, or anyone else, are perfectly free to hold views against religions, to voice these views and to publish them. They may not, however, utilize public facilities to do so. As Mr. Justice Douglas stated in his concurring opinion in Engel v. Vitale (supra, p. 443): ‘ ‘ By reason of the First Amendment government is commanded ‘ to have no interest in theology or ritual ’ * * * for on those matters ‘ government must be neutral. ’ * * * The First Amendment leaves the Government in a position not of hostility to religion but of neutrality. The philosophy is that the atheist or agnostic — the nonbeliever — is entitled to go his own way. The philosophy is that if government interferes in matters spiritual, it will be a divisive force.” A government that finances religion is no longer neutral. Similarly, a government that underwrites attacks on religion is no longer neutral.
The recent case of Tinker v. Des Moines School Dist. (393 U. S. 503) is not at variance with these principles. There, students were forbidden to wear black armbands as a sign of protest against the Viet Nam conflict, and this was held to abridge their right of free speech. The school authorities failed to show that any disruption was caused by this act or indeed that there was even a threat of disruption; no one’s constitutional rights were violated by the wearing of the armbands. The court stated (p. 511): u In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views.” And at page 513: “ [A student] may express his opinions * * * if he does so without ‘ materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school ’ and without colliding with the rights of others.”
*99 The petitioners herein have made a “ showing of constitutionally valid reasons to regulate ’ ’ the contents of these publications— they have shown that the strict neutrality required of government vis-á-vis religion has not been preserved. The published articles also “ collid[ed] with the rights of others/’ that is, the petitioners’ right to have the State refrain from attacking religion.
The petitioners seek an order directing the respondents “ to adopt and enforce rules and regulations ’ ’ prohibiting attacks on religions. Eespondents ’ own papers show that on March 16, 1959 the Board of Higher Education of the City of New York passed a resolution that student publications ‘ ‘ should be reminded by the faculty * # * that affronting a race, or religion in general, or the religion of a particular group, is incompatible with good citizenship, good journalism, and good academic behavior.” This resolution and certain other rules and by-laws were interpreted by this board at its meeting on January 18, 1960 as empowering the appropriate school authorities 1 ‘ to take direct action when material appears in a student publication which is offensive to any race, creed or religion.”
The respondents have failed to enforce their own rules, assuming such rules do in fact preclude the publication of attacks on religion. In any event, the respondents are directed to prevent publication of such articles in the future, whether by enforcement of existing regulations, enactment of new ones, or otherwise.