**John ANTONELLI, Plaintiff,**

v.

**James J. HAMMOND, Defendant.**

**Civ. A. No. 69-1128-G.**

United States District Court,
D. Massachusetts.

Feb. 5, 1970.

Harold C. DuLong, Burlington, Mass., for plaintiff.

Mark L. Cohen, Asst. Atty. Gen., Boston, Mass., for defendant.

---

OPINION

GARRITY, District Judge.

This action is brought under 42 U.S.C. § 1983 and its jurisdictional counterpart 28 U.S.C. § 1343(3). Plaintiff is John Antonelli, a student at Fitchburg State College, a state-supported school of higher education in the Commonwealth of Massachusetts.[1] He was the editor-in-chief of The Cycle, the campus newspaper, when a dispute as to the control of the newspaper arose between the student editorial staff and the college president, defendant James J. Hammond. The complaint in substance is that the defendant Hammond through his power over the purse is censoring the material for publication by subjecting it to the prior approval of a faculty advisory committee. It is also alleged that president Hammond refused to release the usual funds to pay for the printing of an issue of The Cycle containing an article the defendant felt was obscene. Contending that this action is in violation of the First and Fourteenth Amendments to the Constitution of the United States, plaintiff is seeking injunctive relief and a declaratory judgment under 28 U.S.C. §§ 2201 and 2202. The case was tried without jury; several witnesses testified for both parties and the court received memoranda of law, affidavits and certain stipulated facts.

*Findings of Fact*

1. In the spring of 1969 plaintiff Antonelli was duly elected by the student body of Fitchburg State College to serve for one year as the editor-in-chief of the campus newspaper. At the start of the fall semester in September 1969 Antonelli changed the name of the paper from Kampus Vue to The Cycle. The change in name was indicative of a change in policy and format. While

---

1. The complaint was originally brought also in the name of the paper's editorial board. After hearing the court allowed defendant's motion to strike the editorial board as a plaintiff. The board exists solely at the fiat of the editor-in-chief who alone is elected by the student body. The members of the board are merely agents of the editor chosen by him to assist in publishing the campus newspaper.

Kampus Vue's focus had been primarily on student news and events on campus, The Cycle sought to explore and comment upon areas of broader social and political impact.

2. The Cycle is not financially independent. It depends on an allocation of a portion of revenues derived from compulsory student activity fees. In accordance with Mass.G.L. c. 73, § 1B, these fees and any receipts from the student activities themselves are retained in a revolving fund to be expended "as the president of the college may direct in furthering the activities from which the fees and receipts were derived * * *." Prior to the present dispute, the publication costs and other bills of the student newspaper at Fitchburg State College had been consistently paid from this fund. Without this money the campus newspaper cannot be published on a regular basis.

3. On September 21, 1969 an article entitled "Black Moochie" written by Eldridge Cleaver and originally appearing in Ramparts Magazine, Vol. 8, No. 4, October 1969, was included in the material for Vol. 1, No. 3, of The Cycle submitted to Raymond Plante, the paper's usual printer. Mr. Plante, whose daughter is a student at the college, strenuously objected to the theme of and four-letter words generously used in the text of "Black Moochie." He refused to print the article, preferring to smash his presses first, and he telephoned president Hammond to inform him of the content of the edition which the students were asking him to print. Soon thereafter the defendant came to Plante's office and expressed his own displeasure at the proposed issue of The Cycle. He felt that the "Black Moochie" article was "garbage" and obscene and not fit for publication in the campus newspaper. President Hammond had not been pleased with the change in the focus and format that previous issues of The Cycle had brought to the campus newspaper. He stated that publication should provide an opportunity for students to develop skills in journalism, should not consist primarily of compilations published previously elsewhere and should not serve as a vehicle for the dissemination of obscene material.[2] On this occasion and thereafter the defendant indicated to the plaintiff and others that he felt morally obligated to use his powers over the allocation of funds for student activities under G.L. c. 73, § 1B, to see that the money was spent properly and to prevent its expenditure on the publication of such "trash" as "Black Moochie." He stated that therefore he would not consider paying for articles like "Black Moochie" and would refuse to allow future editions of The Cycle to be published unless he or someone acting with his authority approved of all the matter to be included in the newspaper prior to its being printed.

4. In order that some form of student publication continue during the pendency of these proceedings, and under protest, plaintiff agreed to cooperate with an advisory board of two faculty members, Drs. Greene and Quigley, who were appointed by the defendant to exercise their judgment as to the "responsible freedom of the press" in the student newspaper. Under president Hammond's plan, funds from student fees would not be forthcoming for future issues until the issues were approved by the advisory board. Drs. Greene and Quigley were authorized by the defendant to certify the necessary expenditures and approve their payment only after they exercised their judgment as to the "responsible freedom of the press" in the student newspaper. President Hammond expressed his willingness to abide by the judgment of the advisory board.

5. The primary function of the advisory board is to pass on the acceptability of material intended to be pub-

---

2. At the trial, defendant, apparently instructed by his attorney, no longer contended that the "Black Moochie" article was obscene. In this he was correct. See, e. g., Keefe v. Geanakos, 418 F.2d 359, 1 Cir.; Nov. 12, 1969.

lished in The Cycle and to prevent the printing of articles which the administration feels are not fit for the campus newspaper. No guidelines of acceptability were established and no standards limit the discretion of the two faculty members as they pass judgment on the material submitted to them. No procedure was designed whereby the reasonableness or validity of a board decision might be tested or reviewed.

6. Prior to the present controversy, the officials at Fitchburg State College had left control over the content of the campus newspaper entirely to the student editors. Only with the attempted publication of "Black Moochie" did president Hammond feel it necessary to interpose administrative control in the form of the advisory board.

7. The issue of The Cycle containing the article entitled "Black Moochie" was in fact printed and widely circulated both at Fitchburg State College and elsewhere. A different printer did the printing and the costs were not paid for from student activity funds. President Hammond never authorized payments relating to this issue of The Cycle. The publication came about through the combined efforts of the editors of the newspapers of five Massachusetts state colleges, including Fitchburg. There was no evidence that any of the funds expended in connection with this issue belonged to plaintiff or that he has any legal liability with respect to them.

8. On November 7, 1969 plaintiff repudiated his agreement to cooperate with the advisory board and he and the entire editorial board submitted their resignations. This action was announced in the one issue of The Cycle published under the control of the advisory board, Vol. 1, No. 4. It was prompted by disputes with the two faculty members as to the newspaper's financial responsibility and budgetary mechanics.

9. Although the conflict leading to the resignations did not concern material submitted for publication and although the board neither rejected nor censored in any way any of the material actually proposed for the one issue printed under its auspices, the controversy over censorship still colored the relationship of the student editors and representatives of the administration.

10. On November 20, 1969 the resignations were accepted by the student government association of the college. However, in an attempt to avoid the threat of mootness, a special meeting of the student government was called on November 25, 1969 and the previous recognition of the resignations was unanimously withdrawn. The acceptance of the resignations was now to be deemed effective December 17, 1969 rather than November 20.

11. This is not the only indication of support that the student government association has shown for The Cycle and the plaintiff in the dispute over the control of the content of the campus newspaper. On October 14, during a time of cessation in publication, an open meeting of the student government association was held and a motion was debated that another publication, edited by one who opposed The Cycle, be given funds from the newspaper budget to publish a weekly newsletter until the fate of The Cycle was decided. This motion was virtually unanimously defeated.

12. The Cycle has not been published since the announcement of the resignations on November 7. The office of editor-in-chief will have been officially vacant since December 17, 1969. Although he would have to be reelected by the student body, Antonelli testified that he would be willing to run again and serve as editor-in-chief if the advisory board were eliminated.

13. At no time has any disciplinary action been taken by Fitchburg State College against the plaintiff or any other student in connection with the publication of The Cycle.

### Conclusions of Law

█ The first question for decision is whether the case is moot. "Simply

stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome. See E. Borchard, Declaratory Judgments 35–37 (2nd ed. 1941)." Powell v. McCormack, 1969, 395 U.S. 486, 496–497, 89 S.Ct. 1944, 23 L.Ed.2d 491. See also Maryland Casualty Co. v. Pacific Coal and Oil Co., 1941, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826; Golden v. Zwickler, 1969, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113. As argued by the defendant, there has been full publication and circulation of Vol. 1, No. 3 of The Cycle including Eldridge Cleaver's "Black Moochie"; plaintiff did not spend any of his own money and is not liable in law to anyone for the expenses of such publication; the advisory board has not in fact censored any material submitted to it nor denied funds concerning the printing of any article; plaintiff has resigned as editor-in-chief and The Cycle has not functioned since the announcement of his resignation. Under these circumstances, the court rules that plaintiff has no legally cognizable interest in a decision by this court as to the constitutionality of president Hammond's efforts to prevent publication of the issue of The Cycle containing "Black Moochie."

■ However, plaintiff asserts a further and continuing interest, i. e., the right to be free from the burden of submitting future issues of The Cycle to the advisory board for its prior approval. The nature of the legal interest inherent in this claim is such that it is not affected by the factors which moot his other claims. This is true notwithstanding plaintiff's resignation, which was largely due to his unwillingness to "clear" the contents of The Cycle with the advisory board. The pros-

pect of his reelection as editor is not at all insubstantial, considering that he was unopposed last year and has enjoyed the overwhelming support of the student government association. "There is and there ought to be no rule of constitutional standing that, in order to construct a justiciable 'case,' a plaintiff must submit to the very burden whose validity he wishes to attack." Bickel, Foreword: The Passive Virtues, The Supreme Court, 1960 Term, 75 Harv.L. Rev. 40, 52–53. See Staub v. City of Baxley, 1958, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302; Times Film Corp. v. City of Chicago, 1961, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403. We conclude that plaintiff has a continuing personal stake in the outcome of these proceedings[3] and that the case is not moot.

Turning to the merits of the plaintiff's claim to freedom from censorial supervision by the advisory board, we note first the absence of any express limitation on the board's powers to review and approve. All manner of intended publication must be submitted; there is no exception, so there is nothing that does not come within the censor's purview. Therefore, the powers actually conferred could presumably be used, without change in form or need for expansion, to achieve complete control of the content of the newspaper. However, there is no indication of an intention to go beyond excising obscenity, and in any event, for purposes of this case, we must construe the powers conferred upon the advisory board by the defendant in the narrowest light possible, i. e., censorial only over the obscene. This is essential because the plaintiff claims freedom from an obligation to submit anything for prior approval.[4]

3. In view of this ruling, there is no need to elaborate on the possible relaxation of this standard when, as here, constitutional claims are raised. See, e. g., Marchand v. Director, U.S. Probation Office, 421 F.2d 331, 1 Cir., Jan. 13, 1970; Esteban v. Central Missouri State College, 8 Cir. 1969, 415 F.2d 1077, 1079 n. 1; Sibron v. New York, 1968, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917.

4. It follows that plaintiff's claim cannot succeed unless the imposition of any prior restraint by this board is impermissible. Cf. Times Film Corp. v. City of Chicago, 1961, 365 U.S. 43, 81 S.Ct. 391.

No matter how narrow the function of the advisory board, it constitutes a direct previous restraint of expression and as such there is a "heavy presumption against its constitutional validity." Bantam Books, Inc. v. Sullivan, 1963, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584, and cases there cited. The general rules are clear, " * * * [L]iberty of the press, historically considered and taken up by the Federal Constitution, has meant, principally although not exclusively, immunity from previous restraints or censorship." Near v. Minnesota, 1931, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357. Any limitation on the constitutional immunity from prior restraints "is the exception; it is to be closely confined so as to preclude what may fairly be deemed licensing or censorship." Kingsley Books, Inc. v. Brown, 1957, 354 U.S. 436, 441, 77 S.Ct. 1325, 1328, 1 L.Ed.2d 1469.

It is true that the advisory board proposes to suppress only obscene writings and that obscenity does not fall within the area of constitutionally protected speech or press, see, e. g., Alberts v. California, decided with Roth v. United States, 1957, 354 U.S. 476, 485, 77 S.Ct. 1304, 1 L.Ed.2d 1498. However, the manner and means of achieving the proposed suppression are of crucial importance. Cf. Curtis Publishing Co. v. Butts, 1967, 388 U.S. 130, 149, 87 S.Ct. 1975, 18 L.Ed.2d 1094. Whenever the state takes any measure to regulate obscenity it must conform to procedures calculated to avoid the danger that protected expression will be caught in the regulatory dragnet. See, e. g., Marcus v. Search Warrants, 1961, 367 U.S. 717, 731, 81 S.Ct. 1708, 6 L.Ed.2d 1127; Bantam Books, Inc. v. Sullivan, *supra*; Quantity of Copies of Books v. Kansas, 1964,

378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809. See generally, Monaghan, First Amendment Due Process, 1970, 83 Harv. L.Rev. 518. Such procedures are constitutionally required themselves—going to the very nature of the First Amendment rights. "It is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments. Our insistence that regulations of obscenity scrupulously embody the most rigorous procedural safeguards * * * is therefore but a special instance of the larger principle that the freedoms of expression must be ringed about with adequate bulwarks." Bantam Books, Inc. v. Sullivan, *supra*, 372 U.S. at 66, 83 S.Ct. at 637.

The type of procedural safeguards required by the First Amendment was indicated in Freedman v. Maryland, 1965, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649. There the appellant had been convicted for exhibiting a motion picture without submitting it to the Maryland State Board of Censors for prior approval. In sustaining the challenge to the constitutionality of the licensing system because of procedural inadequacies, the Supreme Court listed three minimal requirements: first, that the censor bear the burden of showing the film to be obscene; second, that the requirement of advance submission not be so administered as to give an effect of finality to the censor's adverse determination; and third, that the procedure ultimately assure a prompt final judicial determination.[5]

Nothing of the sort is included in the system devised by the defendant for passing upon the contents of The Cycle. It lacks even the semblance of any of the safeguards the Supreme Court has demanded.[6] The advisory board bears no

5. If anything, safeguards are more essential to protect publishers of a student newspaper than distributors of a motion picture. There the substantial investment involved in producing a movie provides an obvious impetus for the pressing of constitutional claims which is absent in the context of a student newspaper. Therefore the effective finality of

a censor's decision regarding the content of a student newspaper is all the more probable and consequently so is the danger that protected expression will be suppressed.

6. Under the circumstances, we need not decide whether adequate procedural safeguards could ever be formulated support-

burden other than exercising its judgment; there is no appeal within the system from any particular decision; and there is no provision for prompt final judicial determination. Cf. Kingsley Books, Inc. v. Brown, *supra*. Indeed, final responsibility rests with two faculty members, serving at the pleasure of the defendant, who so far as the evidence showed are wholly unfamiliar with the complex tests of obscenity established by the Supreme Court in cases such as Roth v. United States, 1957, 354 U.S. 476, 77 S.Ct. 1304, and the Memoirs, Ginzburg and Mishkin cases, 1966, 383 U.S. 413–518, 86 S.Ct. 975, 942, 958, 16 L.Ed.2d 1, 31, 56. Accordingly, the court concludes that the defendant's establishment of the advisory board is prima facie an unconstitutional exercise of state power.

If the advisory board of The Cycle is to withstand constitutional challenge, it can only be because there is something either in the institutional needs of a public university or in the nature of a newspaper funded from student activity fees that justifies a limitation of free expression and thereby permits an exercise of state power plainly unwarranted if applied to the press generally.

 Free speech does not mean wholly unrestricted speech and the constitutional rights of students may be modified by regulations reasonably designed to adjust these rights to the needs of the school environment. The exercise of rights by individuals must yield when they are incompatible with the school's obligation to maintain the order and discipline necessary for the success of the educational process. However, any infringement of individual constitutional freedoms must be adequately related to this legitimate interest. See, e. g., Tinker v. Des Moines School Dist., 1969, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731; Burnside v. Byars, 5 Cir. 1966, 363 F.2d 744; Brooks v. Auburn University, 1969, M.D.Ala., 296 F.Supp. 188.

██ No such justification has been shown in the instant case. Obscenity in a campus newspaper is not the type of occurrence apt to be significantly disruptive of an orderly and disciplined educational process. Furthermore, assuming that a college administration has a sufficient educationally oriented reason to prevent the circulation of obscenity on campus, there has been no showing that the harm from obscenity in a college setting is so much greater than in the public forum that it outweighs the danger to free expression inherent in censorship without procedural safeguards. If anything, the contrary would seem to be true. The university setting of college-age students being exposed to a wide range of intellectual experience creates a relatively mature marketplace for the interchange of ideas so that the free speech clause of the First Amendment with its underlying assumption that there is positive social value in an open forum seems particularly appropriate. See Brooks v. Auburn University, *supra*, 296 F.Supp. at 192.

 There is an added element in the present case: the expenses of publishing The Cycle are payable by the college from funds received from compulsory student activity fees. Does this circumstance significantly alter either the rights of the students or the powers of the college president over the campus press? We think not. Contrary to the defendant's contention, Mass.G.L. c. 73, § 1B, does not make him ultimately responsible for what is printed in the campus newspaper. Under that section, student activity fees "shall be expended as the president of the college may direct in furthering the activities from which the fees and receipts were derived; * * *" This imposes no duty on the president to ratify or to pass judgment on a particular activity. The discretion granted is in the determination whether the funds to be expended actually further the activi-

---

ing prior restraint of a weekly newspaper. It is extremely doubtful. Newspaper cen-

sorship in any form seems essentially incompatible with freedom of the press.

ties to which they are intended to be applied. Once that determination has been made, the expenditure is mandatory.

We are well beyond the belief that any manner of state regulation is permissible simply because it involves an activity which is a part of the university structure and is financed with funds. controlled by the administration. The state is not necessarily the unrestrained master of what it creates and fosters. Thus in cases concerning school-supported publications or the use of school facilities, the courts have refused to recognize as permissible any regulations infringing free speech when not shown to be necessarily related to the maintenance of order and discipline within the educational process. See, e. g., Dickey v. Alabama State Board of Education, 1967, M.D. Ala., 273 F.Supp. 613; Snyder v. Board of Trustees of University of Illinois, 1968, N.D.Ill., 286 F.Supp. 927; Brooks v. Auburn University, 1969, M.D.Ala., 296 F.Supp. 188; Zucker v. Panitz, 1969, S.D.N.Y., 299 F.Supp. 102; Smith v. University of Tennessee, 1969, E.D. Tenn., 300 F.Supp. 777; Close v. Lederle, 1969, D.Mass., 303 F.Supp. 1109.

These decisions do not stand for the proposition that a state college administration has no more control over the campus newspaper than it would have over a private publication disseminated on campus. In the very creation of an activity involving media of communication, the state regulates to some degree the form of expression fostered. But the creation of the form does not give birth also to the power to mold its substance. For example, it may be lawful in the interest of providing students with the opportunity to develop their own writing and journalistic skills, to restrict publication in a campus newspaper to articles written by students. Such a restriction might be reasonably related to the educational process. See generally, Developments in The Law—Academic Freedom, 1968, 81 Harv.L.Rev. 1045, 1128–1134. But to tell a student what thoughts he may communicate is another matter. Having fostered a campus newspaper, the state may not impose arbitrary restrictions on the matter to be communicated. See Zucker v. Panitz, supra. What was said in Tinker v. Des Moines School Dist., supra, where the form of expression was the wearing of black armbands, is equally applicable here. "In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." 393 U.S. 511, 89 S.Ct. 739.

Because of the potentially great social value of a free student voice in an age of student awareness and unrest, it would be inconsistent with basic assumptions of First Amendment freedoms to permit a campus newspaper to be simply a vehicle for ideas the state or the college administration deems appropriate. Power to prescribe classroom curricula in state universities [7] may not be transferred to areas not designed to be part of the curriculum.

Accordingly, since (a) there is no right to editorial control by administration officials flowing from the fact that The Cycle is college sponsored and state supported, and (b) defendant has not shown that circumstances attributable to the school environment make necessary more restrictive measures than generally permissible under the First Amendment, the court holds and declares that the prior submission to the advisory board of material intended to be published in The Cycle, in order that the

---

7. There is, of course, no occasion here to examine the nature and extent of the power of a state university over its curriculum. See generally, Developments in the Law—Academic Freedom, supra at 1051–1054. See also Keyishian v. Board of Regents, 1967, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629; Epperson v. Arkansas, 1968, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228.

board may decide whether it complies with "responsible freedom of the press" or is obscene, may not be constitutionally required either by means of withholding funds derived from student activity fees or otherwise.

The court declines at this time to issue any injunctive relief. Defendant is a highly placed and responsible public official, and there is no reason to believe that he will not abide by the law as herein declared. Cf. Smith v. University of Tennessee, *supra*.