■ In the Matter of ALFRED PANARELLA, as Parent and Natural Guardian of DANIEL A. PANARELLA, an Infant, Respondent, v. WILLIAM BIRENBAUM, as President of Staten Island Community College of the City University of New York, et al., Appellants. In the Matter of ROBERT MAHONEY et al., Respondents, v. HERBERT SCHUELER, as President of Richmond College, et al., Appellants.— In two consolidated proceedings pursuant to article 78 of the CPLR *inter alia* to compel appellants to adopt and enforce regulations prohibiting attacks against religion from being published in campus newspapers, the appeal is from a judgment of the Supreme Court, Richmond County, dated August 29, 1969, which granted the petitions. Judgment reversed, on the law, with one

bill of $10 costs and disbursements, and proceedings dismissed on the merits. Both proceedings are concerned with the regulation of the content of student newspapers published on the campuses of State-supported colleges which are components of the City University of New York. The Panarella proceeding was precipitated by an article entitled "The Catholic Church — Cancer of Society", which appeared in an issue of a student newspaper known as *The Dolphin* which is published on the campus of Staten Island Community College. As may be presumed from the title, the article is a scathing attack upon the Catholic Church. The Mahoney proceeding was precipitated by an article entitled "From the Hart", which appeared in an issue of a student newspaper known as the *Richmond Times* which is published on the campus of Richmond College. The term "blasphemous" may aptly be employed to describe this article. That both articles may be found to be highly objectionable by many people cannot be doubted. Both newspapers, which are operated by students, are published under the auspices of the colleges funded out of mandatory fees collected from all the students, and are afforded the use of campus facilities. Although general guidelines have been issued by the Board of Higher Education of the City of New York with respect to the standards to be maintained in such publications, actual supervision is left to the administration and faculty of the individual colleges of the City University. It does not appear that either newspaper herein is subject to any control over its editorial policies; nor is prior approval required of the contents of the materials published. Petitioners assert that by the publication of such articles in these college newspapers the force of government has been placed behind them in violation of the Free Exercise clause of the First Amendment to the Constitution of the United States. By the determination appealed from, Special Term has directed respondents, with respect to the two colleges involved herein, to "forthwith prevent attacks on religion in any and all publications" and to "forthwith enforce a strict neutrality toward religion in general and the specific sects thereof in any and all of the publications * * * whether by enforcement of existing regulations, adoption and enforcement of new ones, or otherwise". The rationale relied upon by Special Term is not without persuasion. As repeatedly articulated by the Supreme Court of the United States, the First Amendment mandates that the State maintain a strict neutrality, neither aiding nor opposing religion (*Abington School Dist.* v. *Schempp*, 374 U. S. 203, 225; *Everson* v. *Board of Educ.*, 330 U. S. 1, 18; *McCollum* v. *Board of Educ.*, 333 U. S. 203, 211). The applicability of this principle to the instant case is readily apparent. Since these newspapers are published under the auspices of State-supported institutions and since they are supported by public funds and afforded the use of public facilities, it may very well be argued that their publication constitutes a form of governmental activity. Nevertheless, we are constrained by the weight of authority in this area to hold that appellants may not exercise the regulation imposed herein even if they so desired. These newspapers have been established as a forum for the free expression of the ideas and opinions of the students who attend these institutions of higher learning. It has repeatedly been held that, once having established such a forum, the authorities may not then place limitations upon its use which infringe upon the rights of the students to free expression as protected by the First Amendment, unless it can be shown that the restrictions are necessary to avoid material and substantial interference with the requirements of appropriate discipline in the operation of the school (*Antonelli* v. *Hammond*, 308 F. Supp. 1329; *Lee* v. *Board of Regents of State Coll.*, 306 F. Supp. 1097; *Zucker* v. *Panitz*, 299 F. Supp. 102; *Korn* v. *Elkins*, 317 F. Supp. 138; *Dickey* v. *Alabama State Bd. of Educ.*, 273 F. Supp. 613; *Trujillo* v. *Love*, 322 F. Supp. 1266; *Tinker* v. *Des Moines School Dist.*, 393

U. S. 503; *Burnside* v. *Byars,* 363 F. 2d 744). In *Keyishian* v. *Board of Regents* (385 U. S. 589, 603) it was said: "'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' * * * The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'" There is no showing herein, nor is it contended, that publication of the matter sought to be suppressed constitutes a threat to the orderly functioning of these institutions. We must hold that the imposition of these restrictions upon the operation of campus newspapers is unconstitutional, as an infringement of the right of free expression of the students attending these colleges. Rabin, P. J., Hopkins, Gulotta and Brennan, JJ., concur; Munder, J., concurs only to the extent of the reversal and dismissal as to the Staten Island Community College case, but otherwise dissents and votes to affirm as to the Richmond College case, with the following memorandum: This is an interesting case for two reasons. First, the complaint here is not that certain regulations as promulgated and enforced by a governmental body, viz., the Board of Higher Education of the City of New York, impinged on the rights of individuals, but rather that the board has abdicated its responsibility in not promulgating regulations. Second, the case presents an almost classic confrontation between two basic constitutional freedoms, viz., freedom of the press and freedom to worship (or not to worship) without State interference. The two writings in question appeared in newspapers published by students at two branches of the City University in Richmond County, New York. The students are assisted by faculty advisors employed by the City University; and the newspapers themselves are financed in part by public funds. The first article, which appeared in a newspaper called *The Dolphin,* published at the Staten Island Community College, is entitled "The Catholic Church — Cancer of Society". The article is a diatribe by someone who apparently is a renegade Catholic. The author describes the Church hierarchy as the holy Mafia, which "acts like a social leech sucking the precious blood of society — money." Such language was obviously intended to outrage. The responses to the article, which appeared as letters to the editor, showed that mature readers were less offended than they were disputatious. Such articles, although ill-mannered and repulsive, probably need no official restraint. Accordingly, I join in the reversal and dismissal as to the Staten Island Community College case. The second article, entitled "From the Hart", presents a different situation. It appeared in the *Richmond Times,* published at Richmond College, and is a vile, vulgar and lewd attack upon Christianity in general, and Christ in particular. The question is whether the respondent board can be required to take steps to prevent a repetition of such blasphemy. Freedom of speech and its First-Amendment brother, freedom of the press, are within the liberties safeguarded by the due process clause of the Fourteenth Amendment from invasion by State action (see *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 500). However, not all State invasion is unconstitutional. It depends upon whether the restraint is reasonable or not. The First Amendment is not absolute. As one court has stated, "freedom of speech is not the right to say anything one may please in any manner or place. The rule that the constitutional right to free speech and assembly may be infringed by the State, if there are compelling reasons to do so, must also be considered" (*Baker* v. *Downey City Bd. of Educ.,* 307 F. Supp. 517, 527). This is especially so when dealing with the First Amendment in the context of college or school newspapers. School officials *are* empowered and, indeed, obligated to make reasonable rules to enforce decorum on campus (see 35 Albany L. Rev. 161, Freedom of the Press

in College and High School; see, also, 81 Harv. L. Rev. 1045, 1052, Academic Freedom). In *Baker* (*supra,* p. 527) the court quoted from *Ferrell* v. *Dallas Independent School Dist.* (392 F. 2d 697, 703) as follows: " The interest of the state in maintaining an effective and efficient school system is of paramount importance. That which so interferes or hinders the state in providing the best education possible for its people, must be eliminated or circumscribed as needed. *This is true even when that which is condemned is the exercise of a constitutionally protected right*" (italics added). The Supreme Court of the United States has in effect stated that liberty of expression guaranteed by the First Amendment can be abridged by State officials if their protection of legitimate State interests necessitates an invasion of free speech (see, e.g., *Dennis* v. *United States,* 341 U. S. 494, 510). It is clear from the record at bar that the "authority" here, namely, the Board of Higher Education, was aware of its responsibility in this area. That is, the board recognized its obligation to promulgate rules intended not only to insure harmony and discipline among the students, but also to balance the various constitutional freedoms involved when diverse groups come together in a democratic society. Thus, in January, 1960, the board's Administrative Council sent a report to all members of the board in which it was stated that certain by-laws of the board included provisions with regard to student publications. The report also set forth the following: " It is implicit and explicit in this provision [§ 18.3] and other provisions of the board's by-laws (Sec. 18.4 STUDENT DISCIPLINE, 18.6 DUTIES OF DEANS, and 18.1 RESERVATION OF POWER IN THE BOARD) that students, student groups, teams and publications must conform to the requirements of good manners and good morals and shall obey the laws of the city, state and nation, within college grounds and elsewhere, and may not have any purpose or programs against any race, religion, or any group on the basis of national origin ". Petitioners here seek to have the board live up to its responsibility. I see nothing wrong or vague about that. The student authors have a right to express themselves, but that right is not absolute. It must give way to the right of other students to be free from ridicule about their religious beliefs. The *Richmond Times* article, in my opinion, was in such poor taste and was so offensive to those who profess to be Christians that the board has an obligation, in the name of enforcing decorum on campus and maintaining an efficient school system, and, more important, in the name of protecting the constitutional rights of the student body, to see that it does not happen again. This duty is especially clear where, as here, the vehicle used to ridicule the religious beliefs of others is an arm of the State. Just as the First Amendment prohibits the State from promoting a religion, it also prohibits the State from subverting religion. For these reasons, I would affirm so much of the judgment as concerned the *Richmond Times* article. [60 Misc 2d 95.]