477 F.2d 456
 Johnnie Edward JOYNER, Individually and as Editor-in-Chief
of the Campus Echo; Harvey Lee White, Individually and as
President of the Student Government Association; and both of
them in behalf of all persons similarly situated, Appellants,
v.
Albert N. WHITING, President of North Carolina Central
University, individually and in his official
capacity, Appellee.
 No. 72-1630.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 2, 1972.
Decided April 10, 1973.
 
 Professor Daniel H. Pollitt, Chapel Hill, N. C. (Norman B. Smith, Smith, Patterson, Follin & Curtis, Greensboro, N. C., James V. Rowan, and Paul, Keenan & Rowan, Durham, N. C., on brief), for appellants.
 Burley B. Mitchell, Jr., Asst. Atty. Gen. (Robert Morgan, Atty. Gen. of North Carolina, on brief), for appellee.
 John R. Jordan, Jr., Raleigh, N. C. (Jordan, Morris & Hoke, Raleigh, N. C., on brief), amicus curiae, Board of Governors of University of North Carolina; Professor William W. Van Alstyne, Durham, N. C., amicus curiae.
 Before HAYNSWORTH, Chief Judge, and BUTZNER and FIELD, Circuit Judges.
 BUTZNER, Circuit Judge:
 
 
 1
 Johnnie Edward Joyner, editor of the Campus Echo, the official student newspaper of North Carolina Central University, and Harvey Lee White, president of the university's student government association, appeal from an order of the district court, which (a) denied their application for declaratory and injunctive relief to secure reinstatement of financial support for the Echo, and (b) permanently enjoined Albert N. Whiting, president of the university, and his successors in office, from granting future financial support to any campus newspaper. Joyner v. Whiting, 341 F. Supp. 1244 (M.D.N.C.1972). Joyner and White assert that the decree violates the First and Fourteenth Amendments. President Whiting urges affirmance on the ground that the paper's segregationist editorial policy and racially discriminatory practices violate the Fourteenth Amendment and the Civil Rights Act of 1964. We reverse because the president's irrevocable withdrawal of financial support from the Echo and the court's decree reinforcing this action abridge the freedom of the press in violation of the First Amendment.
 
 
 2
 * EDITORIAL COMMENT
 
 
 3
 The first issue of the Echo under Joyner's editorship published a banner headline on the front page that asked, "Is NCCU Still a Black School," and an article entitled, "Look and You Shall See," which stated in part:
 
 
 4
 "There is a rapidly growing white population on our campus.
 
 
 5
 ____
 
 
 6
 * * *
 
 
 7
 "We want to know why they are here. How many are here? Why more and more come every year (by the hundreds)?
 
 
 8
 ____
 
 
 9
 * * *
 
 
 10
 "But I think that the reason we will be taken over so quickly and so easily is our fault.
 
 
 11
 "Black students on this campus have never made it clear to those people that we are indeed separate from them, in so many ways, and wish to remain so. And until we assume the role of a strong, proud people we will continue to be co-opted. Until we chose to make this clear, by any means necessary, the same thing will continue to happen . . . .
 
 
 12
 "I maintain that we must pick up the cry of Frantz Fanan who has said, 'Each generation must discover its mission, fulfill it or betray it.' And the words of H. Rap Brown, 'I do what I must out of the love for my people. My will is to fight. Resistance is not enough. Aggression is the order of the day.' And more over that we take nothing from the oppressor, but only in turn get that which is ours.
 
 
 13
 "Now will you tell me, whose institution is NCCU? Theirs? Or ours?"In addition, the paper contained a survey of student opinion which reflected strong opposition to the admission of white students.
 
 
 14
 President Whiting responded with the following letter to Joyner:
 
 
 15
 "In my view the September 16 issue of the Campus Echo does not meet standard journalistic criteria nor does it represent fairly the full spectrum of views on this campus. Because of this, I am writing to advise that funds for the publication of additional issues will be withheld until agreement can be reached regarding the standards to which further publications will adhere.
 
 
 16
 "If consensus cannot be established then this University will not sponsor a campus newspaper. That portion of remaining funds collected or allocated to the Campus Echo budget will accrue to the credit of all contributing students for this school year."[1]
 
 
 17
 Despite a meeting to resolve the differences, no agreement could be reached. The president's counsel then advised him that because North Carolina Central University is a state institution he could not constitutionally refuse to financially support the newspaper if his refusal was contingent on the paper's meeting journalistic standards or other subjective criteria. Accordingly, acting on advice of counsel, the president irrevocably terminated the paper's financial support and refunded to each student the pro rata share of the activities fee previously allocated to the Echo. The president took no action to bar Joyner, or any other student, from publishing and circulating a privately funded newspaper on the campus. Indeed, several issues of the Echo were published without the university's financial support, but it became apparent that the paper could not survive unless it received its usual subsidy from the student activities fees.
 
 
 18
 Fortunately, we travel through well charted waters to determine whether the permanent denial of financial support to the newspaper because of its editorial policy abridged the freedom of the press. The First Amendment is fully applicable to the states, Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925); Stromberg v. California, 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), and precedent establishes "that state colleges and universities are not enclaves immune from [its] sweep." A college, acting "as the instrumentality of the State, may not restrict speech . . . simply because it finds the views expressed by any group to be abhorrent." Healy v. James, 408 U.S. 169, 180, 187, 92 S.Ct. 2338, 2345, 2349, 33 L.Ed.2d 266 (1972); see Wright, The Constitution on the Campus, 22 Vand.L.Rev. 1027, 1037 (1969). It may well be that a college need not establish a campus newspaper, or, if a paper has been established, the college may permanently discontinue publication for reasons wholly unrelated to the First Amendment. But if a college has a student newspaper, its publication cannot be suppressed because college officials dislike its editorial comment. Panarella v. Birenbaum, 37 A.D.2d 987, 327 N.Y.S.2d 755, 757 (1971); cf. Danskin v. San Diego Unified School Dist., 28 Cal.2d 536, 171 P.2d 885, 892 (1946).[2] This rule is but a simple extension of the precept that freedom of expression may not be infringed by denying a privilege. Sherbert v. Verner, 374 U.S. 398, 404, 83 S. Ct. 1790, 10 L.Ed.2d 965 (1963).
 
 
 19
 The principles reaffirmed in Healy have been extensively applied to strike down every form of censorship of student publications at state-supported institutions. Censorship of constitutionally protected expression cannot be imposed by suspending the editors,[3] suppressing circulation,[4] requiring imprimatur of controversial articles,[5] excising repugnant material,[6] withdrawing financial support,[7] or asserting any other form of censorial oversight based on the institution's power of the purse.[8]
 
 
 20
 But the freedom of the press enjoyed by students is not absolute or unfettered. Students, like all other citizens, are forbidden advocacy which "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." See Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). Tinker v. Des Moines Ind. Community School Dist., 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969), expressly limits the free and unrestricted expression of opinion in schools to instances where it does not "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." We previously considered these limitations in Quarterman v. Byrd, 453 F.2d 54, 58 (4th Cir. 1971):
 
 
 21
 "Specifically, school authorities may by appropriate regulation, exercise prior restraint upon publications distributed on school premises during school hours in those special circumstances where they can 'reasonably "forecast substantial disruption of or material interference with school activities" ' on account of the distribution of such printed material."
 
 
 22
 In his brief President Whiting acknowledges that there does not appear to have been any danger of physical violence or disruption at the university because of the publication of the Echo. The record, of course, does disclose that the paper's message of racial devisiveness and antagonism was distasteful to the president, and it may well have offended other members of the university community. However, no white faculty members or students complained that the paper's editorial policy incited anybody at the university to harass or interfere with them. The case, therefore, does not present a situation that Brandenburg, Tinker, and Quarterman recognize as justifying restriction of free expression.
 
 
 23
 As a foundation for its decree, the district court fashioned a unique exception to the well established body of law dealing with censorship of college newspapers. Describing the Echo as a state agency, the court upheld the termination of its funding by the university on the ground that the Fourteenth Amendment and Civil Rights Act of 1964 bar a state agency from spending state funds to discourage racial integration of the university "by a program of harassment, discourtesy, and indicia of unwelcome."
 
 
 24
 Censorship of the paper cannot be sustained on the court's theory. The record contains no proof that the editorial policy of the paper incited harassment, violence, or interference with white students and faculty. At the most, the editorial comments advocated racial segregation contrary to the Fourteenth Amendment and the Civil Rights Act of 1964. The court's rationale disregards the distinction between the First Amendment's clause prohibiting the establishment of religion and its clause protecting freedom of the press. Neither federal nor state governments may expend funds to establish a religion. The First Amendment, however, contains no similar ban against speech or press. Both governments may spend money to publish the positions they take on controversial subjects. The speeches and publications that originate in government offices attest to the diversity of views that are freely expounded. But under the rule that President Whiting urges us to affirm, no state official could use his office to criticize, as the editor of the Echo did, government policy on race relations with which he disagrees. We need not decide whether the Echo is a state agency; it is enough to say that even if it were, it would not be prohibited from expressing its hostility to racial integration. The Fourteenth Amendment and the Civil Rights Act proscribe state action that denies the equal protection of the laws, not state advocacy. To be sure, the line between action and advocacy may sometimes be difficult to draw, but it is clear that nothing written in the Echo crossed it.
 
 
 25
 A college newspaper's freedom from censorship does not necessarily imply that its facilities are the editor's private domain. When a college paper receives a subsidy from the state, there are strong arguments for insisting that its columns be open to the expression of contrary views and that its publication enhance, not inhibit, free speech. Cf. Red Lion Broadcasting Co., Inc. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L. Ed.2d 371 (1969). However, this case provides no occasion for formulating a principle akin to the fairness doctrine for the college press. The record does not disclose that Joyner rejected any articles that were opposed to his editorial policy, and President Whiting does not claim the paper refused to publish his pro-integration plea.
 
 
 26
 The president, emphasizing that the students are still free to publish and circulate a newspaper on the campus without university support, protests that the denial of financial support cannot be considered censorship because it is permanent. Permanency, he suggests, does not link the ebb and flow of funds with disapproval or approval of editorial policy. Absent this correlation, he claims, there is no censorship. But this argument overlooks the fact that one of the reasons for the president's withdrawal of funds was his displeasure with the paper's editorial policy. The abridgement of freedom of the press is nonetheless real because it is permanent. Freedom of the press cannot be preserved, as Mr. Justice Frankfurter noted, by prohibitions calculated "to burn the house to roast the pig." Butler v. Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed. 2d 412 (1957). The president has failed to carry the "heavy burden of showing justification for the imposition of" a prior restraint on expression. Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). He has proved only that he considers the paper's editorial comment to be abhorrent, contrary to the university's policy, and inconsistant with constitutional and statutory guarantees of equality. This is plainly insufficient. Healy v. James, 408 U.S. 169, 187, 92 S. Ct. 2338, 33 L.Ed.2d 266 (1972); cf. Brandenburg v. Ohio, 395 U.S. 444, 449, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).
 
 
 27
 Similarly, the district court's permanent injunction against the university's funding of the paper cannot stand. The court's grant of the injunction was intended to protect the student press by eliminating the inducement of future financial support "as a possible method for censorship." But the proper remedy against censorship is restraint of the censor, not suppression of the press. A court, no less than the executive and the legislature, must defer to the First Amendment. Twice in the history of the nation the Supreme Court has reviewed injunctions that imposed prior restraints on the publication of newspapers, and twice the Court has held the restraints to be unconstitutional. New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). In both instances the proof was insufficient to overcome the presumption of unconstitutionality under which prior restraint of expression labors. Because this case is marked by the same defect, the injunction must be dissolved.
 
 II
 DISCRIMINATORY PRACTICES
 
 28
 Early in September of 1971, Joyner, who had been elected editor the previous spring, told the Echo's faculty advisor that the paper would be black-oriented and that neither whites nor foreigners would be allowed to serve as staff members. The first edition of the paper under Joyner's editorship, published later in the month, contained a notice that the paper would not carry advertising for white merchants.
 
 
 29
 The president asserts that the Echo is an agency of the state, and that continued financial support of the paper despite its discriminatory practices would violate the equal protection clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964. In contrast, the Board of Governors of the University of North Carolina[9] takes the position that the Echo is not an agency of the state, but it justifies the president's withholding of funds as a permissible means of enforcing a valid campus regulation proscribing racial discrimination.
 
 
 30
 We need not choose between these theories. Under both of them, the president was justified in prohibiting racial discrimination in staffing the newspaper and accepting advertising. The equal protection clause forbids racial discrimination in extracurricular activities of a state-supported institution. United States v. Jefferson County Bd. of Educ., 372 F.2d 836, 899 (5th Cir. 1966), cert. denied, 389 U.S. 840, 88 S. Ct. 67, 19 L.Ed.2d 103 (1967), and freedom of the press furnishes no shield for discrimination in advertising. United States v. Hunter, 459 F.2d 205, 211 (4th Cir.), cert. denied, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972); cf. Lee v. Board of Regents, 441 F.2d 1257 (7th Cir. 1971). Even if the Echo is not, strictly speaking, an agency of North Carolina, the president was not powerless to act. Campus organizations claiming First Amendment rights must comply with valid campus regulations, Healy v. James, 408 U.S. 169, 191, 92 S. Ct. 2338, 33 L.Ed.2d 266 (1972), and the state, acting throught the president, possesses adequate power to promulgate and enforce rules prohibiting discrimination. Railway Mail Ass'n v. Corsi, 326 U.S. 88, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945).
 
 
 31
 It does not follow, however, that the appropriate remedy for the paper's racial discrimination was the permanent cessation of financial support. During a meeting with the president after suspension of financing, Joyner disavowed his black only staff policy. Moreover, the second issue of the Echo carried a notice repudiating its statement that it would not accept any more business from white advertisers. Henceforth, the notice said, the Echo will "only accept ads from white businesses that employ on an equal opportunity basis."
 
 
 32
 We cannot accept the contention pressed by Joyner and the Board of Governors that the issues of discrimination in staffing and advertising are now moot. Neither the president nor the district court were required to give credence to the disavowal of the discriminatory practices, and, as the president points out, the paper is still free to take ads from black businesses which are not equal opportunity employers. Therefore, on remand, the president should be afforded an opportunity to amend his pleadings to apply for relief against discriminatory practices in staffing and advertising. If he does, the district court should determine whether "there exists some cognizable danger of recurrent violation." United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). If the court finds that this danger exists, it may enjoin these discriminatory practices.
 
 
 33
 The permanent withdrawal of funds, however, is not an appropriate remedy. While the state may suppress speech when it is thoroughly enmeshed with unlawful conduct, Milk Wagon Drivers' Union v. Meadowmoor Dairies, Inc., 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836 (1941), this record fails to disclose that the discriminatory staffing and advertising policies are inextricably related to the news and editorial content of the paper. To comply with the First Amendment, the remedy must be narrowly drawn to rectify only the discrimination in staffing and advertising. Cf. Youngdahl v. Rainfair, Inc., 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957).
 
 III
 
 34
 Two other matters require but brief comment. The parties have argued about the right of a student to resist having a part of his student activities fee allocated to the Echo. Cf. International Ass'n of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). This issue is speculative. No student has protested that he was compelled to subscribe to the paper. We, therefore, express no opinion concerning this aspect of the case.
 
 
 35
 The second issue which we do not reach is the contention that the students have been denied the equal protection of the laws because eleven other state supported universities in North Carolina sponsor college newspapers. In view of our disposition of the case, we find it unnecessary to consider this alternative ground for relief.
 
 
 36
 The judgment of the district court is reversed, and the injunction which it entered is dissolved. This case is remanded for the entry of a declaratory judgment consistent with this opinion. In the exercise of its sound discretion, the district court may grant or withhold injunctive relief. See Antonelli v. Hammond, 308 F.Supp. 1329, 1338 (D.Mass. 1970).
 
 FIELD, Circuit Judge (dissenting in part):
 
 37
 The high regard I have for my brothers of the majority makes me somewhat hesitant to dissent, but I simply do not see this case as they apparently do. No one would now question that the constitutional freedoms of speech and press guaranteed by the First Amendment protect the students of our colleges and universities from unreasonable administrative interference, and the school authorities may not restrict the students' freedom of speech merely because they find the views expressed to be abhorrent. Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), and the related authorities in this area cited by the majority solidly support this principle.[1] However, as pointed out by Professor Van Alstyne in his amicus brief, the issue in this case does not involve the more familiar form of abridgment by restriction of expression of opinion by the students as individuals either on or off the campus of NCCU,[2] nor does it present the case where financial support of the college newspaper was temporarily withheld for the purpose of inducing editorial policies acceptable to the administration. Cf. Antonelli v. Hammond, 308 F.Supp. 1329 (D.C.Mass.1970).
 
 
 38
 The issue as I see it is whether President Whiting had the right if not, indeed, the duty to terminate the University's subsidy of the Echo when he had reasonable grounds to believe that the newspaper was engaged in conduct which was violative of the Constitution and laws of the United States and which, under the circumstances, jeopardized the University's participation in the various federal funding programs necessary to its operation. I submit that President Whiting's decision on this basis to irrevocably discontinue the subsidy to avoid future involvement in the terms of the school's possible responsibility for the editorial content of the Echo, coupled with the express disavowal on his part that the subsidy might be renewed in the event the newspaper would accede to acceptable "journalistic standards" or other subjective criteria, violated no First Amendment rights of the plaintiffs,[3] and that the conclusion of the district court on the primary issue in this case was correct.
 
 
 39
 Referring to the action of the district judge in upholding the termination of the subsidy on the theory that the racist editorial policy of Joyner was violative of the Fourteenth Amendment and the Civil Rights Act of 1964, the majority suggests that he "fashioned a unique exception to the well established body of law dealing with censorship of college newspapers" which cannot be sustained. In all deference, I suggest that there was nothing unique about the rationale of the district court's decision and that it finds solid support in law and in fact.
 
 
 40
 For almost two decades since Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed 873 (1954), the school authorities of this country have been "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. County School Board, 391 U.S. 430 (1968) at 437-438, 88 S.Ct. 1689 at 1694, 20 L.Ed.2d 716. It is an understatement to say that the transition from segregated schools to a non-racial system of public education has not been a simple task, and this is especially true for an educator in the position of President Whiting confronted with the delicate responsibility of converting a previously all black university into an integrated educational facility.
 
 
 41
 The constitutional responsibility to eliminate racial discrimination articulated by the courts has received substantial support from the Congress of the United States, and the national policy against support for segregated education emerged in provisions adopted by the Congress in the Civil Rights Act of 1964. Title VI, Section 601 of the Act, 42 U.S.C. Sec. 2000d, provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Section 602 of the Act, 42 U.S.C. Sec. 2000d-1 directs each federal agency administering programs of financial assistance to take action by rule, regulation or order to effectuate the principles of Section 601, and to effect compliance with those requirements under this section an agency is authorized to terminate or refuse to grant assistance under a program to any recipient as to whom there has been a finding of a failure to comply with such requirements.
 
 
 42
 It is in the context of this background that President Whiting's action should properly be appraised. The majority states that Joyner's message of racial divisiveness and hostility was distasteful to Whiting. This may well be true, but the record clearly shows that the reason for the termination of the subsidy was not President Whiting's personal displeasure with the editorial policy of the Echo but his fear, based upon the advice of the Attorney General of North Carolina, that continued support of the student newspaper could be construed as "state action" in the context of the various civil rights acts passed by the Congress as well as the Federal Constitution. Whiting's apprehension that continued subsidization might jeopardize the University's federal funding was well founded for the federal agencies have not hesitated to act pursuant to Section 602 of the Civil Rights Act and terminate federal assistance where the authorities of a state have failed to take affirmative action to eliminate discrimination in its schools. State of Georgia v. Mitchell, 450 F.2d 1317 (C.A.D.C. 1971); see also, Green v. Connally, 330 F.Supp. 1150 (D.C.D.C.1971), aff'd per curiam sub nom., Coit et al. v. Green et al., 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed. 2d 550 (1971).
 
 
 43
 Unquestionably the activities of the Echo, subsidized as it was by the University, constituted "state action" in the area of civil rights, Lee v. Board of Regents of State Colleges, 441 F.2d 1257 (7 Cir. 1971); Zucker v. Panitz, 299 F. Supp. 102 (S.D.N.Y.1969); Panarella v. Birenbaum, 37 A.D.2d 987, 327 N.Y.S.2d 755 (1971), and if its editorial content was violative of Federal Constitutional or statutory proscriptions, the responsibility necessarily would fall squarely on NCCU. It should be borne in mind that we are not dealing here with a "letter to the editor" nor a casual news article or student poll. What we have before us is the lead editorial in the first issue of the subsidized house organ of NCCU greeting the matriculating students with a clear and violent statement of policy which the district court found to be designed to discourage racial integration of the University "by a program of harassment, discourtesy and indicia of unwelcome." The majority disposes of this finding, however, with the observation that the record fails to show that the editorial policy incited harassment, violence or interference with white students. Conceding that the editorial advocated racial segregation contrary to the Fourteenth Amendment and the Civil Rights Act of 1964, my brothers would countenance it on the ground that it was not proscribed "state action" but was acceptable "state advocacy." I must confess I find the import of this statement somewhat obscure and, assuredly, of questionable validity on the issue before us.[4]
 
 
 44
 In Smith v. St. Tammany Parish School Board, 316 F.Supp. 1174 (D.C.E. D.La.1970), aff'd, 448 F.2d 414 (5 Cir. 1971), the district court ordered all Confederate flags as well as other symbols of racism removed from the schools with this observation at page 1176:
 
 
 45
 "In this connection, the principal of the Covington High School understands today's symbolism of the Confederate battle flag as well as he understands the symbolism of a Black Panther or a Black Power flag. But none of these flags are constitutionally permissible in a unitary school system where both white and black students attend school together. At the moment, the Covington principal insists on the display of the Confederate battle flag; but the display of the flag is an affront to every Negro student in the school, just as the display of the Black Panther flag would be an affront to every white student in a school whose principal was a Negro. * * * The retention of Confederate flags in a unitary school system is no way to eliminate racial discrimination 'root and branch' from the system."
 
 
 46
 I respectfully suggest that Mr. Joyner's editorial policy was at least as much of an affront to the white minority of NCCU as the Confederate flag was to the black students of St. Tammany Parish. Whether we label it "advocacy" or "action," the Echo's editorial policy was violative of the Fourteenth Amendment and the Civil Rights Act of 1964, and President Whiting acted reasonably and responsibly in irrevocably terminating the subsidy and removing the imprimatur of the University from Joyner's racist views.[5]
 
 
 47
 I, of course, am in agreement with the views expressed by the majority relative to the discriminatory staffing and advertising policies of the Echo under Joyner's leadership. I also agree that the district court's permanent injunction against the future funding of any newspaper at NCCU was improper. While this action of the court was designed to eliminate the possibility of the use of such support in the future "as a possible method of censorship," such an anticipatory measure was neither necessary nor appropriate in the disposition of this case. Accordingly, I would affirm the court below in its denial of declaratory and injunctive relief to the plaintiffs, and remand the case with directions to dissolve the permanent injunction against possible future funding.
 
 
 
 [1]
 The president also circulated the following memorandum to all members of the university community:
 "By now I am certain that most of you have read the September 16 issue of the Campus Echo. Because of the very pronounced critical position taken in this paper regarding integration in the University Community, I feel it my duty as President to indicate clearly and unequivocally what the official policy of the Institution is and will continue to be in accordance with the present law of the land and the State of North Carolina. North Carolina Central University has always been opposed to any policies and practices which deprive any individual of a right or a privilege because of race, color, creed, or national origin. It will not extend recognition to or knowingly affiliate with and condone any group, organization, or association, espousing policies which discriminate on such bases.
 "Because of historical circumstances issuing out of the shameful segregated past this institution is and will continue to be in the foreseeable future predominantly Black or Negro (whichever word one chooses to use here is a matter of personal choice). It has had a prideful and heroic educational tradition and in its various forms, from the date of its founding, has contributed significantly and effectively to the development and well-being of those who have had the good fortune to attend. Because of relatively recent social changes, integration on all college and university campuses and, as a matter of fact, in all legitimate schools has become more visible. This is no longer a reversible trend and it is sheer folly to think otherwise. Presently, at North Carolina Central University we have an array of ethnic and racial types but in actuality only a statistically insignificant number of non-Negroes. This notwithstanding, the point that I wish to make is that as a State-Supported Institution especially, but also in terms of what is morally and legally right, this institution is not a 'Black University' and does not intend to become one.
 "To those who find this assertion and this fact uncomfortable and/or intolerable I wish to make it perfectly clear that they must, while here, operate within the framework of the University policies regarding this. If this is not possible, then my advice is to seek enrollment and/or employment in institutions where such attitudes are acceptable.
 "In line with this point of view, I am herewith announcing that all funds for the publication of the Campus Echo have been temporarily suspended until consensus can be established regarding the journalistic standards to which this paper will adhere and its role on this campus. If consensus cannot be developed, then the university will no longer sponsor a campus newspaper and that proportion of funds collected and allocated to the budget of the Campus Echo will accrue to the credit of all contributing students for this school year."
 
 
 [2]
 In Danskin, Mr. Justice Traynor dealt with the validity of a school board rule requiring persons seeking use of a school auditorium for meetings to take an oath renouncing the overthrow of the government by force or unlawful means. In holding that such a requirement violated the First Amendment, he wrote:
 "It is true that the state need not open the doors of a school building as a forum and may at any time choose to close them. Once it opens the doors, however, it cannot demand tickets of admission in the form of convictions and affiliations that it deems acceptable." 171 P.2d at 892.
 
 
 [3]
 Scoville v. Board of Educ. of Joliet Tp. H. S. Dist. 204, 425 F.2d 10 (7th Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); Sullivan v. Houston Ind. School Dist., 307 F.Supp. 1328 (S.D.Tex.1969); Dickey v. Alabama State Bd. of Educ., 273 F.Supp. 613 (M. D.Ala.1967)
 
 
 [4]
 Channing Club v. Board of Regents, 317 F.Supp. 688 (N.D.Tex.1970)
 
 
 [5]
 Quarterman v. Byrd, 453 F.2d 54 (4th Cir. 1971); Eisner v. Stamford Bd. of Educ., 440 F.2d 803 (2d Cir. 1971); Trujillo v. Love, 322 F.Supp. 1266 (D. Colo.1971); Panarella v. Birenbaum, 37 A.D.2d 987, 327 N.Y.S.2d 755 (1971)
 
 
 [6]
 Korn v. Elkins, 317 F.Supp. 138 (D.Md. 1970); Zucker v. Panitz, 299 F.Supp. 103 (S.D.N.Y.1969)
 
 
 [7]
 Korn v. Elkins, 317 F.Supp. 138 (D.Md. 1970); Antonelli v. Hammond, 308 F. Supp. 1329 (D.Mass.1970)
 
 
 [8]
 Trujillo v. Love, 322 F.Supp. 1266 (D. Colo.1971); Korn v. Elkins, 317 F.Supp. 138 (D.Md.1970); Antonelli v. Hammond, 308 F.Supp. 1329 (D.Mass.1970); Dickey v. Alabama State Bd. of Educ., 273 F.Supp. 613 (M.D.Ala.1967); Panarella v. Birenbaum, 37 A.D.2d 987, 327 N.Y.S.2d 755 (1971); see Developments in the Law-Academic Freedom, 81 Harv. L.Rev. 1045, 1130 (1968): "[S]tate financial support alone is not enough to prevent application of the first amendment to student newspapers."
 
 
 [9]
 The Board is the governing body of the University of North Carolina system, which includes North Carolina Central University. It filed a brief amicus curiae
 
 
 [1]
 The majority apparently recognizes, however, that a university has no constitutional responsibility to establish a campus newspaper. See Dickey v. Alabama State Board of Education, 273 F.Supp. 613, 618 (M.D.Ala.1967); Cf. Danskin v. San Diego Unified School District, 28 Cal.2d 53, 171 P.2d 885, 892 (1946)
 
 
 [2]
 Neither Joyner nor anyone else was subjected to suspension, expulsion, or any other reprisal; nor as stated by the majority, was there any attempt by President Whiting to suppress the publication or circulation of any privately funded newspaper on the campus. These factors are sufficient to distinguish this case from practically all of the authorities cited by the majority
 
 
 [3]
 It should be noted that in a post-subsidy issue of the Echo, Joyner wrote an article relative to the institution of this litigation in the district court which carried the utterly tasteless and offensive headline "So, We took his ass to court." Demonstrating commendable restraint and respect for Joyner's First Amendment rights of expression, President Whiting took no punitive or repressive action against either Joyner or the publication
 
 
 [4]
 The nub of the present controversy becomes more readily apparent if we reverse the circumstances. Suppose that incident to a program of integration, the advent of black students on the campus of a previously all white state-supported university in North Carolina or elsewhere had been greeted by a similar message in the subsidized university newspaper denouncing the admission of blacks to the institution. I submit that this court or any court would have had little difficulty in finding such "advocacy" to be state action which was violative of the law of the land
 
 
 [5]
 Even should it be assumed arguendo that the Echo's editorial policy was not violative of the law, the record clearly supports the conclusion that President Whiting acted in the reasonable belief that Joyner's conduct was illegal and, under these circumstances, termination of the subsidy could well be sustained under the rationale of Sellers v. Regents of University of California, 432 F.2d 493 (9 Cir. 1970)