Johnnie Edward **JOYNER**, Individually and as Editor and Chief of The Campus Echo, Harvey Lee White, Individually and as President of the Student Government Association, and both of them in behalf of all persons similarly situated, Plaintiffs,

v.

Albert N. **WHITING**, President of North Carolina Central University, Individually and in his official capacity, Defendant.

No. C–227–D–71.

United States District Court,
M. D. North Carolina,
Durham Division.
March 7, 1972.
Judgment April 7, 1972.

James V. Rowan, and David B. Hough, Durham, N. C., and Norman B. Smith, Greensboro, N. C., for plaintiffs.

Burley B. Mitchell, Jr., and Charles A. Lloyd, Raleigh, N. C., for defendant.

## MEMORANDUM OPINION

GORDON, Chief Judge.

### I.

On September 24, 1971, the defendant herein, Albert N. Whiting, President of North Carolina Central University, at Durham, North Carolina, tentatively determined that the University should no longer collect mandatory student fees for the purpose of allocating such fees to the student newspaper, *The Campus Echo*, and thereby no longer require all students at North Carolina Central University to subscribe to and support the student newspaper. The events leading up to this action by the defendant, which action is herein attacked by the plaintiffs, appear thus to this Court.

On September 15, 1971, one of the plaintiffs herein, Johnnie Edward Joyner, Editor-in-Chief of *The Campus Echo* informed Mrs. Jean N. Scales that no white or other non-Negro would be able to serve on the staff of *The Campus Echo*. This information was immediately transmitted to the defendant Whiting.

On September 16, 1971, the plaintiff Joyner published and circulated an issue of *The Campus Echo*, dated September 16, 1971, and identified as Vol. 1, No. 1. On the second page thereof, this Court finds the following statement:

"ATTENTION Beginning next issue *The Campus Echo* will not run white advertising."

On the first page is found an article expressing some considerable dissatisfaction at and opposition to the increasing number of whites and other non-Negro students enrolled at the North Carolina Central University. On the last page is found an article concerning student reaction to the increase of non-Negro students, all of which opinions expressed a strong opposition to the integration of the North Carolina Central University.

On September 24, 1971, the defendant Whiting issued a Memorandum in which he expressed disagreement with the policies of *The Campus Echo*, and stated in part that North Carolina Central University " . . . will not extend recognition to or knowingly affiliate with and condone any group, organization, or association, espousing policies which discriminate on such bases." [1]

On September 24, 1971, the defendant Whiting transmitted to one of the plaintiffs herein, Johnnie Edward Joyner, a letter in which he stated that *The Campus Echo* did not either meet standard journalistic criteria nor represent fairly

1. The text of the Memorandum is as follows:

"TO: All Members of the University Community

"FROM: Albert N. Whiting, President

"RE: The September 16 Issue of the *Campus Echo*

"DATE: September 24, 1971

"By now I am certain that most of you have read the September 16 issue of the *Campus Echo*. Because of the very pronounced critical position taken in this paper regarding integration in the University Community, I feel it my duty as President to indicate clearly and unequivocally what the official policy of the Institution is and will continue to be in accordance with the present law of the land and the State of North Carolina. North Carolina Central University, has always been opposed to any policies and practices which deprive any individual of a right or a privilege because of race, color, creed, or national origin. It will not extend recognition to or knowingly affiliate with and condone any group, organization, or association, espousing policies which discriminate on such bases.

"Because of historical circumstances issuing out of the shameful segregated past this institution is and will continue to be in the foreseeable future predominantly Black or Negro (whichever word one chooses to use here is a matter of personal choice). It has had a prideful and heroic educational tradition and in its various forms, from the date of its founding, has contributed significantly and effectively to the development and well-being of those who have had the good fortune to attend. Because of rela-

tively recent social changes, integration on all college and university campuses and, as a matter of fact, in all legitimate schools has become more visible. This is no longer a reversible trend and it is sheer folly to think otherwise. Presently, at North Carolina Central University we have an array of ethnic and racial types but in actuality only a statistically insignificant number of non-Negroes. This notwithstanding, the point that I wish to make is that as a State-Supported Institution especially, but also in terms of what is morally and legally, right, this institution is not a 'Black University' and does not intend to become one.

"To those who find this assertion and this fact uncomfortable and/or intolerable I wish to make it perfectly clear that they must, while here, operate within the framework of the University policies regarding this. If this is not possible, then my advice is to seek enrollment and/or employment in institutions where such attitudes are acceptable.

"In line with this point of view, I am herewith announcing that all funds for the publication of the *Campus Echo* have been temporarily suspended until consensus can be established regarding the journalistic standards to which this paper will adhere and its role on this campus. If consensus cannot be developed, then the University will no longer sponsor a campus newspaper and that proportion of funds collected and allocated to the budget of the *Campus Echo* will accrue to the credit of all contributing students for this school year."

the full spectrum of views on the campus of North Carolina Central University. Therein also he informed the plaintiff Joyner that funds for *The Campus Echo* would be withheld pending agreement as to standards to which the publication would adhere.

On October 1, 1971, the plaintiffs herein commenced this action, seeking to enjoin the defendant Whiting from failing to support financially *The Campus Echo*.

On November 8, 1971, the defendant announced the permanent and irrevocable termination of compulsory funding of *The Campus Echo*, in accordance with his tentative decision so to do on September 24, 1971. This decision was reached, it would appear, as a resolution of the same dilemma which now presents itself to this Court.

### II.

The Constitution of the United States, in the Fourteenth Amendment thereto, provides that no citizen shall be denied the equal protection of the laws. The Civil Rights Act of 1964, Title VI, 42 U.S.C. § 2000d further provides that:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

North Carolina Central University is an Institution of Higher Education established under and operating pursuant to G.S. § 116–44.10. The governing authority of North Carolina Central University is appointed in accordance with the General Statutes of North Carolina. North Carolina contributes both tax revenues and escheats to North Carolina Central University, and authorizes the collection of tuition and fees from students. There can be no doubt that North Carolina Central University is an agency of North Carolina, and, as such, is subject to the provisions of the Constitution of the United States. Further, North Carolina Central University receives financial aid from the United States, in accordance with several Acts of Congress. In order to continue receiving funds, and to escape liability for those funds previously received, North Carolina Central University cannot directly or indirectly, overtly or covertly, discriminate on the ground of race, color, or national origin, in determining to whom and to what extent the several various benefits of North Carolina Central University shall be extended.

■ Any organization, association or group which has been established under the authority of North Carolina Central University and pursuant to its regulations, and which has received financial aid and support from North Carolina Central University, whether from funds received from North Carolina directly, out of taxes and escheats, or from funds collected by North Carolina Central University under the authority of North Carolina, or both, is an agency of North Carolina Central University, and, therefore, indirectly, of North Carolina itself. *The Campus Echo* was established by North Carolina Central University, and, until September 24, 1971, was financially supported by North Carolina Central University. It received a portion of the student fee which North Carolina Central University required each student to pay as a prerequisite to registration. The Editor-in-Chief received a salary, though it is not clear whether this is paid from funds received through the student fee or from funds received through tuition and the contributions of North Carolina. *The Campus Echo*, as a matter of law, is an agency of North Carolina Central University and of North Carolina. The Editor-in-Chief of *The Campus Echo* is a salaried official of both North Carolina Central University and of North Carolina.

■ As set out above, the law is clear: No State or Agency of a State may discriminate upon the basis of race, color, or national origin. No Institution of Higher Education, established and financially supported by a State, may use racial criteria in its employment prac-

tices, in its admission policies, or in its academic program. No agency of such an Institution, nor any other official body, may use racial criteria. United States v. Georgia, et al., Civil No. 12,972 (N.D.Ga.1969); Georgia, et al. v. Mitchell, et al., Civil No. 265–70 (D.D.C. 1970).

Furthermore, the State of North Carolina has been for the past eighteen years under an affirmative duty to disestablish the dual system of education under which it had operated for almost a century. See Swann v. Charlotte-Mecklenburg County Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed. 2d 554 (1971); Green v. School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). This duty extends to the elimination of racially identifiable Institutions of Higher Education as well as the elimination of racially identifiable institutions of primary and secondary education. The State of North Carolina may not do indirectly what it may not do directly, for acts generally constitutional are invalid when done to accomplish an unconstitutional end. See Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). Neither the State of North Carolina nor any of its officials may discourage persons interested in attending a certain institution from attending such institution on account of race, color, or national origin. This prohibition extends not only to direct failure to admit or to admit upon equal standards, but also to official and unofficial state supported harassment, discourtesy, and indicia of unwelcome at particular Institutions of Higher Education.

This Court finds that *The Campus Echo*, an agency of the State of North Carolina, did consistently and intentionally attempt to discourage the attendance of persons of non-Negro race from attending the North Carolina Central University, by a program of harassment, discourtesy, and indicia of unwelcome. *The Campus Echo* was as

intent upon maintaining North Carolina Central University as a "black school" as were others in times past upon maintaining the University of North Carolina as a "white school." The State of North Carolina may no more lawfully require the financial support of *The Campus Echo* then it may contribute lawfully to certain forms of symbolic free speech by the Ku Klux Klan. Had the State of North Carolina and the North Carolina Central University continued such support of *The Campus Echo,* such support would have been unlawful as contrary to 42 U.S.C. § 2000d and to the Fourteenth Amendment to the Constitution of the United States.

### III.

However, the First Amendment to the Constitution of the United States explicitly guarantees that, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The Fourteenth Amendment to the same Constitution has been construed to extend this particular prohibition to the states.

The restrictions placed upon the Congress and the states by these provisions of the Constitution have never been construed strictly. They have been found to prevent the government, State or Federal, from imposing upon any segment of the people any sort of orthodoxy, no matter how beneficial such orthodoxy might be to the body politic. Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1969); Keyishian v. Board of Regents of New York, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). The classroom and the school are particularly the "marketplace of ideas," which require a discovery of "truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'" Keyishian v. Board of Regents of New York, *supra* at 640. An "authoritative

selection" may be made directly, by means of excluding certain views, by the censorship of a certain newspaper, by the prohibition of the distribution of certain publications, or by the dismissal of the author of the writing in question. See Zucker v. Panitz, 299 F.Supp. 102 (S.D.N.Y.1969); Sullivan v. Houston Independent School District, 307 F.Supp. 1328 (S.D.Texas 1969); Eisner v. Stamford Board of Education, 440 F.2d 803 (2nd Cir. 1971); Trujillo v. Love, 322 F.Supp. 1266 (D.Colo.1971); Dickey v. Alabama State Board of Education, 273 F.Supp. 613 (M.D.Ala.1967). Such "authoritative selection" may be made indirectly also, by means of the *temporary* suspension of funds or resources pending a change in point of view or a change in personnel. Antonelli v. Hammond, 308 F.Supp. 1329 (D.Mass.1970); Close v. Lederle, 303 F.Supp. 1109 (D. Mass.1969). Direct or indirect, such censorship is unlawful. See also, Dickson v. Sitterson, 280 F.Supp. 486 (M.D. N.C.1968). No orthodoxy or particular point of view may be imposed by any means, direct or indirect, upon the students at any institution of education, by the State of North Carolina or any of its agencies. Even to favor an orthodoxy so beneficial as the belief that racial integration is good is as much forbidden by the Constitution of the United States as it is for the State to favor the belief that the world was created in six days. See Epperson v. Arkansas, *supra.*

■ A student newspaper, such as *The Campus Echo,* is part of the press, and is, therefore, entitled to the protection of the Constitution otherwise granted under the First Amendment. Dickey v. Alabama State Board of Education, *supra;* Antonelli v. Hammond, *supra.* Neither the State nor any of its agencies may impose any censorship, any orthodoxy, upon such a newspaper or its editors. "The State is not necessarily the unrestrained master of what it creates and fosters." Antonelli v. Hammond, *supra* at 1337.

## IV.

■ Two Constitutional mandates, which are, indeed, the most compelling of state policies, therefore, were presented to the defendant Whiting and are now presented before this Court. The Constitution and laws of the United States require that North Carolina impose and support no orthodoxy, without regard to the benefit adhering to such state imposed point of view. But they also require that North Carolina, directly or indirectly, refrain from supporting any activity designed and intended to cause or continue discrimination upon the ground of race, color, or national origin, or to reestablish a dual system of state supported institutions of higher education in North Carolina. There appears but one resolution to this dilemma. North Carolina, its officers and agencies, must remain strictly neutral with regard to the press, student or otherwise. They must neither impose censorship or orthodoxy, nor support any student newspaper at North Carolina Central University. The press, student or otherwise, must be free to crusade for integration, segregation, black power, white supremacy, pan-africanism, or repatriation, but it must do so without the financial aid of North Carolina.

■ The initial statements of the defendant Whiting show an improper emphasis upon his duties under the Fourteenth Amendment, in which consideration of "journalistic criteria" dangerously resemble an attempt at censorship. However, upon advice of counsel, the defendant Whiting recognized his equally compelling duties under the First Amendment, and has permanently and irrevocably terminated compulsory student support for *The Campus Echo,* and for any other student newspaper which may be established at North Carolina Central University. Having made available a forum for ideas, North Carolina Central University may not *temporarily* suspend this forum, but it may permanently abolish it. See Close v. Lederle, *supra.*

 North Carolina Central University, having determined to terminate compulsory student support for a campus newspaper, *The Campus Echo,* during the editorship of the plaintiff, Johnnie Edward Joyner, may not hereafter restore compulsory student funding to *The Campus Echo* nor to any other campus newspaper. Were it to be permitted at any time in the future to restore financial support, it might thereby secure more acceptable editorial and reportorial views, from the same or other personnel. This would be a most blatant form of censorship violative of the Constitution of the United States. The University may neither discourage one point of view nor, by financial aid, encourage another. See Antonelli v. Hammond, *supra.*

 The defendant Whiting has submitted, upon his own behalf, an affidavit that North Carolina Central University has determined irrevocably to cease the financial support, from any source, of any campus newspaper. While this Court sees no cause to question the intentions of the defendant Whiting; considering the ambiguous nature of the earlier remarks and acts of the defendant Whiting, dangerously resembling ∘censorship, the Court believes that the better protection of the First Amendment rights of the plaintiffs and their class requires that future financial support for any campus newspaper at North Carolina Central University, of any sort, by any means, direct or indirect, from any source of funds, be declared unlawful. Only by such a declaratory judgment may the inducement of possible financial support be eliminated as a possible method for censorship of student publications in the future, by either the defendant Whiting or his successors at North Carolina Central University.

For the foregoing reasons, the relief requested by the plaintiffs is denied. Accordingly, within ten days, counsel for the defendant shall submit to the plaintiff for approval as to form, and thereafter to this Court, a proposed judgment, incorporating therein a provision declaring unlawful and in violation of the Constitution of the United States, any future financial support, by any means and from any source of funds, direct or indirect, of a campus newspaper by North Carolina Central University or any agency thereof.

### JUDGMENT

This Court having found the facts and law as set out in its opinion as filed on March 7, 1972, it is

Ordered, adjudged and decreed that:

1. The actions of the plaintiffs with regard to the staffing and advertising policy of *The Campus Echo* and their consistent and intentional program of harassment, discourtesy and indicia of unwelcome to white students by means of that publication, having been found unlawful and in violation of the Fourteenth Amendment to the Constitution of the United States and the Civil Rights Act of 1964, Title VI, 42 U.S.C. § 2000d, the action of the defendant Whiting in refusing to require mandatory financial support by students of *The Campus Echo,* is, therefore, not in violation of the Constitution and laws of the United States; and

2. The Constitution and laws of the United States require that the defendant, an agent of the State of North Carolina, not impose and support any form of censorship or orthodoxy by means of direct or indirect financial assistance to *The Campus Echo,* a student newspaper; and

 3. The plaintiffs may publish and distribute, for profit or otherwise, their publication upon the campus of North Carolina Central University, but it is declared and adjudged that it shall be unlawful and in violation of the Constitution of the United States for the defendant or his successors in office to grant any future financial support from any source of funds, direct or indirect, to a campus newspaper at North Carolina

Central University, and the defendant and his successors in office are hereby ordered to refrain from any such action; and

4. The parties shall bear their own costs.