**Robert Lane ARRINGTON et al.,
Plaintiffs,**

v.

**Ferebee TAYLOR and William Friday
et al., Defendants.**

**No. C–220–D–72.**

United States District Court,
M. D. North Carolina,
Durham Division.

Aug. 28, 1974.

Richard J. Bryan, Jefferson, N. C., for plaintiffs.

John R. Jordan, Jr., William R. Hoke, Jordan, Morris & Hoke, Attys., Raleigh, N. C., for Ferebee Taylor, William Friday, Joseph C. Eagles, Jr., Board of Trustees of University of North Carolina at Chapel Hill, and The Board of Governors of University of North Carolina.

H. Hugh Stevens, Jr., Robert W. Spearman, Raleigh, N. C., for intervening defendant Susan Miller.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

GORDON, Chief Judge.

### FINDINGS OF FACT

*Jurisdiction, Venue and Parties*

1. This action is brought under 42 U.S.C. § 1983 and the Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, and venue under 28 U.S.C. § 1391(b).

2. Plaintiff, Robert Lane Arrington, and the other five plaintiffs, are all citizens and residents of North Carolina and at the time of the institution of this action, students in good standing at the University of North Carolina at Chapel Hill (hereinafter, the University).

3. Plaintiffs have paid all fees due and owing by them to the University.

4. Plaintiffs are taxpayers to and of North Carolina.

5. Original defendants are Ferebee Taylor, Chancellor of the University; William C. Friday, President of the University of North Carolina; Joseph C. Eagles, Jr., Vice Chancellor for Business and Finance of the University; the Board of Trustees of the University; and the Board of Governors of the University of North Carolina. The original defendants in their official capacities are officers and agents of the State of North Carolina.

6. Intervening defendant, Susan Miller, is a student in good standing at the University and is Editor-in-Chief of *The Daily Tar Heel.*

### Collection and Disposition of Student Activities Fees

7. The defendant Board of Governors has been authorized by N.C.G.S. § 116–11(7) to establish the amount of tuition and all mandatory fees, including the Student Activities Fee to be paid by each University student each semester. Before the Board of Governors began its official existence as such in 1972, this authority was vested with the Board of Trustees of the University of North Carolina, the predecessor of the Board of Governors.

8. The Board of Governors and its predecessor have exercised the authority to set Student Activities Fees for the University. The revenues from the collection of these fees in 1970, 1971, and 1972 were more than $250,000.00 each year. The current University Student Activities Fee rates are $9.00 per semester for undergraduate students, $7.00 per semester for graduate and professional students, and $3.00 for summer school students. All regularly-enrolled University students are required to pay the Student Activities Fees, and plaintiffs have paid them.

9. A student who fails to pay any part of his accounts with the University, including the Student Activities Fees, is assessed a late payment penalty. If the account is not paid at the end of a term or semester, the University will refuse to issue grades, a transcript of credits, or a diploma.

10. The Board of Governors' predecessor, the Board of Trustees, authorized the Student Legislature (now called the Campus Governing Council) to allocate among the several student organizations and activities the funds derived from the Student Activities Fee. However, at least a certain amount was required to be allocated each semester and term to and for the benefit of the Carolina Union.

11. The Board of Governors' predecessor, the Board of Trustees, has altered the amount of the Student Activities Fee without the request or consent of the Student Government of the University.

12. The defendant Board of Governors and its predecessor, the Board of Trustees, has the ultimate authority pursuant to N.C.G.S. § 116–11(7) over the collection and allocation of the funds collected from the Student Activities Fee. Therefore, the defendant Board of Governors has the power and authority to determine the amount disbursed to *The Daily Tar Heel.*

13. University Student Activities Fees are collected and disbursed in the following manner: Each student is billed for the mandatory Student Activity Fee along with his other obligations to the University. As payments are made by students, the collections are deposited by University employees in North Carolina National Bank in a Student Activity Fee account. A separate bank account is maintained at Central Carolina Bank and Trust Company by the Student Activities Fund Office, an agency of Student Government and primary disbursing agent

for the proceeds of the Student Activity Fees which were appropriated by the Campus Governing Council and its predecessor, the Student Legislature. When employees or vendors are to be paid from the Student Activities Fee proceeds in accordance with an appropriation of the Campus Governing Council, a requisition is signed by the fiscal representative of the organization on whose behalf payment is being made, and a check payable to the employee or vendor is drawn by the Director of the Student Activities Fund Office on the Student Government account at Central Carolina Bank and Trust Company. The Student Activities Fund Office account at Central Carolina Bank is then reimbursed from the University's Trust Fund Accounting Section Account at North Carolina National Bank when copies of the requisition and the Student Activities Fund check are presented to the University Trust Fund's accounting section. An alternative procedure is available whereby the fiscal agent of the student activity and the Director of the Student Activities Fund Office sign a requisition and present it to the University's Trust Fund account section which writes a check payable to the payee on the Student Activities Fee account at North Carolina National Bank.

14. The actions of employees of the University in paying over Student Activities Fees to the Student Activities Fund Office are purely ministerial activities, and such employees exercise no discretion in determining whether such payments should be made so long as the credit balance in the North Carolina National Bank student activities fee account is sufficient to cover the expenditure.

15. The Campus Governing Council and its predecessor, the Student Legislature, have for many years appropriated funds for the benefit of *The Daily Tar Heel* (along with other student activities). Such appropriation for *The Daily Tar Heel* for 1972–73 was $54,800.00, and has exceeded $30,000.00 for each of the fiscal years since 1968. The original defendants do not decide or determine

and have not attempted to decide or determine the amount of Student Activities Fees allocated to *The Daily Tar Heel.* During summer school, appropriations from the proceeds of Summer School Student Activities Fees are made by student government to various organizations, including a summer school edition of *The Daily Tar Heel,* in a manner not materially different from that employed during the regular academic year.

16. The Business Manager of each organization, including the Business Manager of *The Daily Tar Heel,* receives funds transferred to it from the Treasurer of the Student Body. Acting under the authority of the Treasurer of the Student Body, the Business Manager of *The Daily Tar Heel* disburses funds to pay for goods and services secured by *The Daily Tar Heel.*

17. The manner and procedures for the disbursement of funds derived from the collection of the mandatory Student Activities Fees has been altered within the past three years by certain of the original defendants without the knowledge or consent, and upon the protest, of the Student Government of the University.

*Student Government at the University*

18. The members of the Campus Governing Council and its predecessor, the Student Legislature, are elected annually by and from the student body, and every University student in good standing, including the plaintiffs, is eligible to seek election to the Council and to vote for the election of its members. This Campus Governing Council, which is composed exclusively of students, is the legislative branch of the Student Government of the University. The Campus Governing Council now has and exercises the authority to allocate the proceeds of the Student Activities Fees, except for that portion which automatically goes to the Carolina Student Union.

19. The President of the Student Body of the University is the chief executive officer of the Student Government.

He is, by law, a member of the Board of Trustees of the University, a defendant herein.

20. The judicial branch of the Student Government consists of the Honor Courts and a Supreme Court of the Student Body.

21. The establishment and development of student government at the University has been acquiesced in and approved by the original defendants.

22. The Student Government of the University occupies, rent-free, buildings owned by the State of North Carolina and furnished for the benefit of the University.

23. The original defendants and their predecessors have delegated to the Student Government of the University, and have acquiesced in the assumption by the Student Government of power and authority with regard to the discipline of students. The Student Government performs a variety of other governmental functions.

24. It is within the authority of the Chancellor of the University to revoke any such express or implied delegation of power and authority of the Student Government, either upon his own initiative or upon the direction of the Board of Governors of the University of North Carolina.

### The Daily Tar Heel

25. *The Daily Tar Heel* is a student newspaper published at the University by the Publications Board, a student government agency. *The Daily Tar Heel* occupies offices rent-free in the Frank Porter Graham Student Union, a University owned building, along with many other student organizations.

26. The editor and other employees of *The Daily Tar Heel* are paid by the Publications Board from funds derived wholly or partly from University Student Activities Fees. The Campus Governing Council establishes the salary of the editor upon recommendation of the Publications Board.

27. The Constitution of the Student Government of the University provides for the Publications Board, which Board publishes and distributes *The Daily Tar Heel*. The Publications Board is an agency of the Student Government of the University.

28. The Publications Board has published with the financial support of the mandatory Student Activities Fee, three publications since 1968: *The Daily Tar Heel*, the *Yackety-Yack*, and the *Carolina Quarterly*.

29. The Chancellor of the University, a defendant herein, appoints two members of the faculty of the University as members of the Publications Board, for a two-year term, one term expiring each year, upon the recommendation of the student members of the Publications Board. The faculty members who are members of the Publications Board have and exercise the right to vote in all matters before said Publications Board, each member, student or faculty, having one equal vote.

30. The Publications Board has the power to supervise the financial administration of *The Daily Tar Heel* and to exercise overall financial supervision over *The Daily Tar Heel*, subject to the appropriation voted by the Campus Governing Council and to the limitations prescribed by the Constitution of the Student Government and the by-laws of the Publications Board enacted by the Campus Governing Council. The Publications Board approves the terms of all contracts of employment between *The Daily Tar Heel* and the members of its staff, recommends to the Campus Governing Council a proposed annual budget for *The Daily Tar Heel*, and establishes advertising rates for *The Daily Tar Heel*.

31. The Editor-In-Chief (hereinafter Editor) of *The Daily Tar Heel* is elected solely by the student body. Any student in good standing at the University can seek election to this position. The Editor of *The Daily Tar Heel* is vested with final authority and responsibility over the form and contents of the newspaper.

32. The Editor may be recalled and removed from office in accordance with the student constitution and the student election laws. During the 1955–56 academic year, an unsuccessful attempt to recall co-editors was initiated. Controversial positions taken by *The Daily Tar Heel* prompted this action. In 1957, the Editor was recalled and removed from office by a group of dissatisfied students.

33. *The Daily Tar Heel's* annual operating budget is funded by monies derived from subscriptions, from the Student Activities Fees appropriated by the Campus Governing Council, and from advertising receipts. In 1972–73, *The Daily Tar Heel* advertising revenue was approximately $85,000.00; the appropriation from the Student Activities Fee was approximately $54,000.00; approximately $2,000.00 was received from subscriptions.

34. The Editor of *The Daily Tar Heel* has full authority over the day to day operation of the newspaper, including its form, content and editorial positions. The Editor customarily delegates certain portions of this authority to subordinates, including a news staff, a business department, a sports department, an editorial board, and to various firms and individuals for whose services *The Daily Tar Heel* contracts.

35. The two associate editors report directly to the Editor and have overall responsibility for the layout and editing of the editorial page, except for the material written by the Editor for inclusion within the unsigned editorial column. The associate editors select the content of each day's editorial page from among the columns, letters, and editorial cartoons that are available and ready for publication. The associate editors, acting under the authority and at the direction of the Editor, may from time to time solicit or otherwise arrange for columns to be written by contributors on a regular basis. Columns considered especially interesting, pertinent or informative are occasionally reprinted from other media.

36. The managing editor of *The Daily Tar Heel* is generally considered to have overall authority for the daily production of the paper, and to be subordinate only to the Editor. His primary duty is to insure that the various subordinate editors meet their respective deadlines with copy, headlines, and layout. The managing editor customarily exercises judgment concerning the wording of headlines, choice of photographs, display of various stories or features, and other routine production decisions.

37. The news editor is responsible for seeing that, insofar as possible, the overall content of *The Daily Tar Heel's* news columns are "newsworthy" and otherwise meet accepted journalistic standards of interest, information and objectivity. The news editor also assigns reporters to compile information and "cover" events. The events to be covered by *The Daily Tar Heel* are those considered newsworthy by the news editor, the reporters, and the managing editor. The reporters assigned to various individual stories select, with the advice and assistance of the various editors, specific facts and quotes and their lengths.

38. The feature editor has overall responsibility for those general interest stories which, by reason of their general subject matter, are considered by journalistic standards to be "feature" articles rather than "news" articles. The feature editor selects topics, assigns writers, and edits the feature articles subject to the advice and approval of the other editors, including the Editor.

39. The wire editor is in charge of state, national, and international news. He selects and edits stories supplied to *The Daily Tar Heel* by United Press International, to whose news service *The Daily Tar Heel* currently subscribes.

40. Staff members for *The Daily Tar Heel* are selected through the process of application and interviews. Persons wishing to write for *The Daily Tar Heel* are requested to complete a standard application, a section of which requires the applicant to write a news story based on

certain factual information supplied. Persons wishing to be copy editors also complete standard applications, which consist of editing a story and writing headlines for it. Feature and sports writers are selected on the basis of experience and ability; applicants usually submit examples of their work which are discussed and evaluated by the appropriate editors. The standard applications referred to above are drawn up by the editorial board of *The Daily Tar Heel,* which applications have been in effect for two years.

42. *The Daily Tar Heel's* contents customarily include items of various kinds, including, but not limited to, the following: news stories concerning campus, local, state, national and international events; feature articles of general interest; advertisements; photographs; letters to the Editor; sports stories and articles concerning campus, local, state, national and international athletic news; signed columns of opinion expressing the individual points of view of their authors; unsigned editorials expressing the point of view of the Editor; cartoons and drawings; and headlines, photograph captions and other usual ancillary words or markings used to facilitate the layout or display of the primary contents.

43. *The Daily Tar Heel* regularly publishes signed columns, unsigned editorials, letters to the Editor, and other material wherein various opinions are expressed concerning campus, local, state, national and international subjects, including, but not limited to, political, economic, social, and philosophical issues. The expressions of opinion published in various forms by *The Daily Tar Heel* include a broad spectrum of views concerning a wide variety of issues.

44. *The Daily Tar Heel* has published unsigned editorials endorsing candidates for public office.

45. *The Daily Tar Heel* has published unsigned editorials expressing the Editor's point of view concerning various public issues.

46. *The Daily Tar Heel* routinely publishes letters to the Editor disagreeing with unsigned editorials. Some such letters have disagreed with the editorial endorsements and endorsed other candidates.

47. Readers of *The Daily Tar Heel* may and do submit unsolicited articles or columns for publication, and *The Daily Tar Heel* has in the past published articles or columns written by persons who are not regularly employed by *The Daily Tar Heel.*

48. Letters addressed to the Editor of *The Daily Tar Heel* are selected for publication by the associate editors on the basis of general interest, clarity and expression of diverse and varied viewpoints. Letters are not accepted which are considered libelous, in bad taste, or repetitious in subject matter. Space limitations prevent publication of all letters.

49. *The Daily Tar Heel* does not purport to, nor does it in fact, present all views on various issues. The Editor retains final authority over the contents of the publication and has, in the past, exercised this authority to refuse to print articles and letters which differ in viewpoint from his own. An example illustrative of this practice occurred in September, 1969, when Miss Louise Trent Oliver, a regular columnist for *The Daily Tar Heel,* submitted a column in which she advocated that the payment of funds by the University to and for the benefit of *The Daily Tar Heel* be terminated. The Editor refused to print the column and thereafter requested no columns from Miss Oliver.

50. Although *The Daily Tar Heel* from time to time has been criticized by many persons, no person acting for or on behalf of the University has censored the contents of *The Daily Tar Heel.* The original defendants do not control the contents of *The Daily Tar Heel,* although they have expressed displeasure at, and disagreed with, its contents.

51. On May 26, 1969, the Honorable Thomas J. White, a member of the Board

of Trustees of the University, the predecessor to the defendant, the Board of Governors of the University of North Carolina, moved in a meeting of the Board that the Board of Trustees go on record as deploring and condemning the use of vulgarity in student publications, and that, pending further action of the Board of Trustees, no part of funds comprising student fees be collected or disbursed for the support of *The Daily Tar Heel*. The second part of this motion was withdrawn, and the first part, condemning the use of vulgarity, was adopted unanimously.

52. On May 26, 1969, Dr. Carlyle Sitterson, a predecessor to the defendant Taylor, stated that the University administration had asked the Publications Board, composed of faculty and student voting members, to consider with the Editor of *The Daily Tar Heel* and his staff their responsibility to the University and the State for responsible editorship.

53. On November 14, 1969, a Mr. Davis, a member of the Executive Committee of the Board of Trustees of the University, moved that certain articles published in *The Daily Tar Heel* on November 1, 1969, and November 6, 1969, be held in the opinion of the Executive Committee of the Board of Trustees to be reprehensible and out of keeping with the standards of journalism in the University which motion was approved unanimously.

54. In March, 1970, a committee of seven persons, appointed by Dr. Carlyle Sitterson, a predecessor to the defendant Taylor, submitted a report which, among other suggestions, recommended that:

(a) The Publications Board be given power to supervise all aspects of student publications, rather than merely the financial affairs of the publications;

(b) The Publications Board shall develop "guidelines" for the various publications;

(c) The Publications Board shall either appoint the Editor of *The Daily Tar Heel*, or shall nominate, by way of endorsement, the only candidates allowed to seek election as Editor of *The Daily Tar Heel;*

(d) The Publications Board, or a "subboard," be given power to initiate the removal of an Editor, with final removal power vested in either the Student Legislature, the predecessor to the Campus Governing Council, or the whole Publications Board, upon a finding of "clear irresponsibility;"

(e) The "responsible publisher" of *The Daily Tar Heel* be either the Publications Board or a "sub-board;"

(f) The United Press International wire service be discontinued; and

(g) A "continuing relationship" with students in the School of Journalism be developed, with provision for academic credit for news articles written for *The Daily Tar Heel*.

55. The aforementioned committee was composed of the Dean of the School of Journalism, John B. Adams; the Associate Dean of Student Affairs, James O. Cansler; the Chairman of the Publications Board, Gunar Fromen; the Treasurer of the Student Body, Guilford Waddell; one other student and two other faculty members.

56. There is no procedure by which a student at the University who disagrees with the editorial or reportorial positions taken by *The Daily Tar Heel* may be excused or exempted from payment of that portion of the mandatory Student Activities Fee proportionate to the portion of the funds derived from such Student Activities Fee disbursed to and for the benefit of *The Daily Tar Heel*.

57. In September, 1972, William Robert Grady, a plaintiff herein, declined to pay that portion of the Student Activities Fee proportional to that portion of the funds derived from the collection of the Student Activities Fee which are disbursed to and for the benefit of *The Daily Tar Heel*, and was required to pay a late payment fee of Five Dollars.

58. From time to time there exists on the campus of the University a por-

tion of the student body, varying in size according to the issue, that does not agree with the opinions expressed in *The Daily Tar Heel* concerning that issue.

59. The plaintiffs disagree with the positions taken by *The Daily Tar Heel* endorsing the candidacies of Hubert H. Humphrey, Robert W. Scott, Howard Lee, Steve Bernholz, Joe Nassif, Mary Prothro, Ross Parrington, Sam Holton, Marvin Silver, Terry Sanford, A. B. Coleman, Trish Sanford, Dave Kitzmiller, Flo Garrett, George McGovern, Richard Whitted, Ike Andrews, Sargeant Shriver, Nick Galifinakis, Jim Hunt and Ed Holmes.

60. The plaintiffs disagree with the positions taken by *The Daily Tar Heel* concerning the adoption of a Chapel Hill and Carrboro Bus System, the use of busing to integrate public schools, James C. Gardner, Spiro T. Agnew, the United States intervention in Cambodia, the impeachment and removal of Richard M. Nixon, the appointment of William H. Rehnquist, the death penalty, the Equal Rights Amendment, student strikes, Food Worker's strikes, protests against the war in Southeast Asia, and abortion.

61. The plaintiffs disagree with the positions taken by *The Daily Tar Heel* endorsing the candidacies of Todd Cohen, Tom Gooding, Joe Stallings, Richard Epps, Ford Runge, and Steve Saunders.

62. The plaintiffs disagree with the positions taken by *The Daily Tar Heel* concerning the National Student Association, and the continued subsidization of *The Daily Tar Heel.*

63. The plaintiffs disagree with the positions taken reportorially by *The Daily Tar Heel* concerning United States intervention in Cambodia, the Vietnam Moratorium, the Equal Rights Amendment, the lettuce boycott, student political polls, the Black Student Movement, the DTH Legal Defense Fund, and civil liberties in Pitt County.

64. The plaintiffs disagree with the positions taken in and through signed columns in *The Daily Tar Heel* concern-ing the Equal Rights Amendment, revolutionary activity, and Wilbur Hobby.

65. Persons who are now and who have been students in good standing at the University disbelieve and disagree with the positions, editorial and reportorial, taken by *The Daily Tar Heel.* Plaintiffs and others are free to disagree with, criticize, and oppose any opinion published in *The Daily Tar Heel.* ·

66. The Student Government of the University is an agency of the University, and a manifestation of state action for the purposes of the Fourteenth Amendment to the Constitution of the United States.

67. *The Daily Tar Heel* when performing functions other than publication, is an agency of the University, and a manifestation of state action, for the purposes of the Fourteenth Amendment to the Constitution of the United States.

68. The Editor of *The Daily Tar Heel* is an officer of the University, and a manifestation of state action in his capacity as Editor, for the purposes of the Fourteenth Amendment to the Constitution of the United States.

69. The disbursement of funds derived from mandatory Student Activities Fees to and for the benefit of *The Daily Tar Heel* creates the possibility of censorship by the original defendants.

70. Neither the University nor *The Daily Tar Heel* imposes or attempts to impose an orthodoxy or point of view concerning religious, moral, philosophical, ideological, and political ideas upon any individual or group of individuals.

71. *The Daily Tar Heel* acts as an important adjunct to the academic experiences of students at the University by publishing a wide range of issues and views, and by informing students and other members of the University community about local events.

72. In addition to its role as a medium for the publication of news and the dissemination of views and opinions, *The Daily Tar Heel* acts as an informal but important "laboratory" for journalism students and others at the Univer-

sity. At least two editors of *The Daily Tar Heel*, Lenoir Chambers and Horace Carter, have won Pulitzer Prizes.

73. Numerous publications at the University other than *The Daily Tar Heel* are supported in part by mandatory student fees.

74. Proceeds from mandatory student fees at the University are used to finance the expression of ideas in programs other than publications at the University. Such fees are used to support the visiting speaker program known as The Caroline Symposium. Withdrawal of student fee support for such activities would damage the educational experience of students at the University.

## DISCUSSION

### *Plaintiffs have Standing to Maintain this Lawsuit*

■ Plaintiffs in this case are students in good standing at the University of North Carolina at Chapel Hill. As such they are required to pay, and have paid, a Student Activities Fee in addition to tuition and other costs. Funds from this fee are appropriated to *The Daily Tar Heel*; it is this expenditure of the Student Activities Fee which is challenged by the plaintiffs. Plaintiffs have shown an immediate and direct interest in the outcome of this litigation. If they prevail in their contentions, the defendants will be enjoined from any further efforts to exact compulsory fees for *The Daily Tar Heel* and plaintiffs will be entitled to reimbursement of funds already paid by them for that purpose. If the defendants prevail, plaintiffs will, of course, be entitled to no relief and must continue to pay the Student Activities Fee as a condition of attending the University. It is, therefore, concluded that the plaintiffs have alleged "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions . . ." Baker v.

Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

■ Plaintiffs additionally have standing as taxpayers of North Carolina to challenge the constitutionality of expending funds by the State University to support *The Daily Tar Heel*. Standing in such suits has traditionally been upheld even though standing in an analagous suit by a federal taxpayer to challenge a federal expenditure may be denied. E. g., Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1970); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Everson v. Bd. of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1946). Indeed, the more stringent test established in Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), to test the standing of a federal taxpayer may well be met in this case.

■■ Plaintiffs do not have standing to bring a claim for relief on the basis of censorship of *The Daily Tar Heel* by University officials. Such censorship or attempts at censorship may have occurred and would, of course, constitute a violation of First Amendment rights. Joyner v. Whiting, 477 F.2d 456 (4th Cir. 1973); Antonelli v. Hammond, 308 F.Supp. 1329 (D.Mass.1970). Even if it is as plaintiffs contend, that the mere existence of the system of financial support for *The Daily Tar Heel* now in effect chills the free expression of ideas so as to violate the First Amendment, this cause of action belongs to those whose rights are thereby infringed. One cannot assert the constitutional rights of another. Plaintiffs have not alleged, and have made no factual showing, that their freedom of expression has been infringed by University action (except to the extent that they contend that the compulsory Student Activity Fee impinges their rights). At best, plaintiffs allege that their right to receive information is somehow unconstitutionally limited by the system they attack. The right to receive and possess information and ideas is implicit in, and a part of, First

Amendment rights. Kleindienst v. Mandel, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed. 2d 683 (1972); Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). Each of these cases, however, involve specific conduct by state or federal authorities, which would have as its purpose or effect the denial to individuals of information they rightfully may possess. There is no such denial alleged in this case. The most that can be said in behalf of plaintiffs' position is that the University's actions provide still another source of information, albeit, in an unconstitutional manner. Accordingly, facts and conclusions regarding actual or potential censorship in this case have been determined only insofar as they are necessary to resolve the issues with respect to whether plaintiffs have standing to sue.

*The Actions of the Defendants in Financing The Daily Tar Heel Constitutes State Action for the Purposes of the Fourteenth Amendment to the Constitution of the United States*

The test for determining what campus related activities at state universities constitute state action for the purpose of civil rights actions was set forth in Joyner v. Whiting, 341 F.Supp. 1244 (M.D.N.C.1972), rev'd on other grounds, 477 F.2d 456 (4th Cir. 1973). The relevant language in that opinion appearing below dictates the result in the case at bar:

"Any organization, association or group which has been established under the authority of North Carolina Central University and pursuant to its regulations, and which has received financial aid and support from North Carolina Central University, whether from funds received from North Carolina directly, out of taxes and escheats, or from funds collected by North Carolina Central University under the authority of North Carolina, or both, is an agency of North Carolina Central University and, therefore, indirectly, of North Carolina itself. *The Campus Echo* was established by North Carolina Central University, and, until September 24, 1971, was financially supported by North Carolina Central University. It received a portion of the student fee which North Carolina Central University required each student to pay as a prerequisite to registration. The Editor-in-Chief received a salary, though it is not clear whether this is paid from funds received through the student fee or from funds received through tuition and the contributions of North Carolina. *The Campus Echo*, as a matter of law, is an agency of North Carolina Central University and of North Carolina. The Editor-in-Chief of *The Campus Echo* is a salaried official of both North Carolina Central University and of North Carolina." Joyner v. Whiting, supra, 341 F.Supp. at 1247.

■ The Student Government occupies and operates on premises owned by the University, and thus by the State; the Student Government is organized as and performs the functions of a governmental body; the Student Government derives its authority from the University; the Student Government receives direct and indirect financial assistance from the University. See James v. Nelson, 349 F.Supp. 1061 (N.D.Ill.1972).

*The Daily Tar Heel's* relationship to the University is identical to that of *The Campus Echo* to North Carolina Central University. Joyner v. Whiting, *supra,* 341 F.Supp. 1247. Judge Field, in his dissenting opinion in Joyner v. Whiting, stated, "unquestionably the activities of the Echo, subsidized as it was by the University, constituted 'state action' in the area of civil rights . . ." Joyner v. Whiting, 477 F.2d 456, 466 (4th Cir. 1973) (Judge Field, dissenting.) Other courts have similarly held. E. g. Lee v. Board of Regents of State Colleges, 441 F.2d 1257 (7th Cir. 1971). It does not necessarily follow that *The Daily Tar Heel* is a state agency for all purposes. Because it is a University sponsored activity, clearly *The Daily Tar Heel* could

not hire or fire on the basis of race. When it is published, however, *The Daily Tar Heel* functions much more as an independent newspaper, than a state agency. For reasons that follow, it is not necessary to decide whether *The Daily Tar Heel* is for all purposes a state agency and therefore all of its acts are those of the State; the distinction could be controlling in other fact settings. However, the resolution of this issue must await its proper time.

*The Use of Mandatory Student Fees to Subsidize The Daily Tar Heel does not Violate the Plaintiffs' Rights under the First and Fourteenth Amendments to the Constitution*

■ Plaintiffs contend in this action that their First Amendment rights of free speech are abridged by requiring them, as students of the University, to pay a Student Activities Fee (hereafter Fee), a portion of which is used to subsidize a University publication, *The Daily Tar Heel*, which takes positions and advocates ideas contrary to those held by the plaintiffs.

In Lathrop v. Donohue, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961), a lawyer challenged the requirement that he join and pay dues to an integrated state bar association. The plaintiff contended that the bar association as an organization took positions and expressed opinions on various issues contrary to his own, and that to require him to join and pay dues to the bar association violated rights guaranteed him by the First Amendment to the United States Constitution. The plaintiff was not compelled to attend meetings nor otherwise participate in the organization's activities. The Court, therefore, considered only the constitutionality of compelling the plaintiff to provide financial support to the bar association. Lathrop v. Donohue, *supra*, 367 U.S. 828, 81 S.Ct. 1826.

Justice Brennan, writing for the Court, held that compulsory membership, which consisted solely of the requirement to pay annual dues, did not violate the plaintiff's constitutional right of free associa-

tion. The bar association had as its primary function the improvement and education of the state legal profession, with its political functions of only secondary importance. Plaintiff was not required to associate with the bar beyond the dues requirement. Under these circumstances, the court held that the plaintiff's freedom of association was not infringed. Lathrop v. Donohue, *supra*, 367 U.S. 842–843, 81 S.Ct. 1826; see also International Association of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); Railway Employees' Dept. v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1955).

Unfortunately the court in *Lathrop* failed to decide a second constitutional issue presented in that case. The plaintiff contended that the mandatory membership dues he was required to pay to the bar association violated his right of free speech by compelling him to subscribe to opinions contrary to his own. Although five Justices of the Court felt that this issue was properly before them and should be decided, the Court held that the plaintiff failed to allege specific positions and views propogated by the bar association which conflicted with those held by him, and that the free speech issue was therefore not ripe for consideration. Lathrop v. Donohue, *supra*, 367 U.S. 845–846, 81 S.Ct. 1826. This issue, discussed by five members of the Supreme Court but not decided by that body, is squarely presented in the case at hand. Plaintiffs allege with particularity specific positions taken by *The Daily Tar Heel* with which they disagree. During the period that the University newspaper expounded these views, the plaintiffs were required to tender monies to the University which were used to support this publication. The free speech issue discussed in *Lathrop*, but not decided, is now before this Court for resolution.

Despite the rather common practice of subsidizing school publications with Student Activities Fees, there is a scarcity of authority on the issue presented in this case. However, although Lath-

rop v. Donohue is without precedential authority, four Supreme Court Justices in three separate opinions discussed the free speech issue which the Court as an institution failed to decide. In an exhaustive opinion Justice Harlan, with whom Justice Frankfurter concurred, enumerated all of the suggested impingements on free speech which could result from requiring a person to join and pay dues to a bar association. Lathrop v. Donohue, *supra*, 367 U.S. 849–885, 81 S.Ct. 1826. Of these five which he listed, four have relevance to the case at bar, and therefore Justice Harlan's analysis of each of these will be reviewed.

The first possible effect which could result from compelling a person to contribute to an organization (the integrated bar association) which engages in political activity would be to reduce a dissident member's economic capacity to espouse causes in which he believes. Justice Harlan dismisses this argument as untenable. To so hold would make every governmental exaction constitutionally suspect, including the federal income tax.

Secondly, the use of these fees by a state-created bar association to support various policies and views could arguably lead to the "governmental 'establishment' of political belief . . . ." This is rejected by Justice Harlan as factually inaccurate. The bar association involved did not speak for the state, and when it adopted a position it lacked the prestige of the government adopting this position. In effect, although a creation of the state, it was separate from it. It simply is not a "predictable conduit" upon which the government can rely.

Thirdly, the increased power of the group (bar association) could tend to "drown out" the voice of its dissenting members. Justice Harlan rejects this as a rational fear by rejecting its premise. In his view, the voice of a dissenter is no less effective because it first is heard in an attempt to influence the group decision and then, if necessary, in opposition to that group. The funds of the dis-

senter are not used in furtherance of views he opposes, but are rather used for a group expenditure about which he has the power and opportunity to influence. Moreover, absent a showing that the increased affluence of the group substantially diminished the dissenter's opportunity to be heard (Justice Harlan conceded this possibility), there is no constitutional infringement.

Finally, Justice Harlan discussed the assertion that to compel a person to pay dues to an organization which espouses views contrary to his own in effect compels him to adopt and affirm those views. The difference in degree between, on the one hand, being required to affirm a belief or a particular position and adopt that belief as one's own and, on the other hand, being required to contribute dues to an association which may ultimately adopt views as a group contrary to those held by the dues payor, is of such a magnitude as to amount to a difference in substance. The state's purpose in establishing the bar association was not to promote any particular position or program nor to compel its members to subscribe to positions ultimately adopted by it. Although pure motive would never permit a government to require a person to espouse a position he disagreed with, that motive becomes relevant when the connection between the payment of the plaintiff's dues and the views of the bar association with which he disagrees is factually so remote.

Justice Harlan concluded his analysis by balancing the slight infringements, if any there were, on the plaintiff's First Amendment rights against the state interest involved in establishing the integrated bar association.

The approach adopted by Justice Harlan and Frankfurter provides an analytical tool by which the issue in the case at bar can be considered.

█ Any contention that the mandatory fee exacted from the plaintiffs, only a portion of which is used to support *The Daily Tar Heel*, reduces their economic ability to further their positions

**1362**

is unsupportable. Economic capacity and First Amendment rights are only remotely related, if related at all. Moreover, to allow a taxpayer to refuse to pay that portion of his taxes which is used for informational purposes would undermine the entire tax collection system. This principle seems fully applicable here. Plaintiffs' economic capacity to advocate their views has been only incidentally lessened, and this slight infringement is not of such proportions as to render the procedure unconstitutional.

The second potential infringement, governmental establishment of political belief, will be more fully discussed *infra*. Here, the focus is not on the individual who is required to support the governmental activity complained of (support of *The Daily Tar Heel*) but on the practice itself.

■ The fear on the part of the plaintiffs that the use of their funds to support views with which they disagree will "drown out" their own voices is the corollary of the diminished economic capacity effect already discussed. Justices Harlan and Frankfurter felt that this fear was more imagined than real in the fact setting they considered. Their observations seem even more applicable to the case now under consideration. In *Lathrop*, ultimately the bar association would adopt a position on a subject and this would become the official position of that Association. *The Daily Tar Heel*, although it advocates positions on various matters, speaks only for those which control its content at any given time. It does not speak on behalf of a group with which the plaintiffs are identified, i.e., the student body. Rather, it provides a forum for those who operate it to express their views. The positions advocated in *The Daily Tar Heel* are no more permanent than the brief tenure of its editors and writers. Moreover, *The Daily Tar Heel* is much more than a forum for its staff. It not only prints timely local and national news items, but also invites and prints views contrary to expressions by those in control. Plaintiffs' voices have not been

drowned relative to that of a group to which they belong. There is no group, and plaintiffs have available an additional forum to express themselves in opposition to views set forth therein.

■ Finally, positions adopted and presented by *The Daily Tar Heel* are not imposed upon the plaintiffs because they are required to provide financial support to it. Much of the prior analysis is applicable here. Plaintiffs are members of no group on whose behalf *The Daily Tar Heel* speaks. This situation is unlike that in *Lathrop*. There plaintiff was a member of the bar association which adopted and promoted positions on various subjects. Those views were much more readily attributable to the plaintiff in that case, a lawyer and member of the bar, than would be the case here. Nevertheless, Justices Harlan and Frankfurter found no First Amendment infringements. *The Daily Tar Heel's* position on a given subject is no more attributable to (and therefore imposed upon) plaintiffs than is the position of the Federal Government on South Vietnam attributable to each of the citizens who annually pay their federal taxes.

Justice Harlan also suggests that where governmental action results in a very slight infringement on First Amendment rights, this infringement must be examined in light of the government's purpose and motive. The University subsidizes *The Daily Tar Heel* for several purposes, none of which involves the desire to propagate a particular position or point of view. The publication is a useful device to inform the student body of noteworthy campus activities. It also prints pertinent local, national and international news. Perhaps its most important function is to complement classroom education by exposing the student body to various points of view on significant issues, and to allow students to express themselves on those issues. Far from being a "predictable conduit" upon which the state can depend to express its views, *The Daily Tar Heel* has published diverse

views on a variety of issues, often conflicting with and criticizing governmental policies. There is simply no factual basis for concluding that the University's motives in maintaining financial support for *The Daily Tar Heel* are other than laudable.

Under the foregoing analysis, it is concluded that requiring the plaintiffs to pay a mandatory fee, a portion of which is used to subsidize *The Daily Tar Heel* does not violate First Amendment rights guaranteed to the plaintiffs. In arriving at this conclusion, this Court is not unmindful of the thoughtful opinions of Justices Black and Douglas in International Association of Machinists v. Street, *supra*, and Lathrop v. Donohue, *supra*. Nevertheless, it is felt that in this important area of individual liberty, one does well to apply objective criteria which are readily adaptable to varying fact patterns. Justices Harlan and Frankfurter have provided in *Lathrop* an analytical approach by which this can be accomplished, and this Court is not dissuaded from following this approach here.

What authority there is on the specific issue now under consideration supports the result reached herein. In a recently decided case factually indistinguishable from the case now at bar, Judge Urbom held that use of mandatory student fees to subsidize a student newspaper, a student association, and a guest-speaker program did not violate the First Amendment rights of students who disagreed with opinions expressed in those activities. Veed v. Schwartzkopf, 353 F.Supp. 149 (D.C.Neb.1973), aff'd without opinion, 478 F.2d 1407 (8th Cir. 1973). Judge Urbom recognized that the activities complained of were meaningful parts of the educational process and complemented formal.classroom instruction, and reasoned that to subsidize these activities from student fees violated no constitutional rights of the students. Veed v. Schwartzkopf, *supra*, 353 F.Supp. 152. Significantly, the opinion in *Veed* recognized that there was no legal distinction between a student newspaper and a col-

lege speaker program. Each provides a forum whereby differing views on controversial subjects are presented. The resulting stimulant to student participation and discussion is at the core of the educational process. Indeed, there is really no difference once the student moves inside the classroom. Teachers, with salaries paid in part from tuition, present differing views on pertinent subjects in an educational setting. That a teacher may present one viewpoint as more meritorious than another surely does not deny to students in that classroom their constitutional rights.

*The Use of Public Funds to Support The Daily Tar Heel does not Violate the Plaintiffs' Rights under the First and Fourteenth Amendments to the Constitution of the United States*

Defendants financially support *The Daily Tar Heel* in two ways. First, defendants levy student fees and make the funds derived from these fees available for appropriation to the newspaper. Secondly, defendants make available, rent-free, University (therefore state owned) office space and other facilities. Plaintiffs contend that it follows that this results in the establishment by the State of particular viewpoints and religious beliefs in violation of the First Amendment.

▮ To resolve this issue, it is probably sufficient to repeat what has been stated earlier in this opinion. There has been no factual showing that *The Daily Tar Heel* was created for, or has ever been used for, the furtherance of a particular governmental position or program. Although the University-subsidized newspaper is a state agency for purposes of the First and Fourteenth Amendments, Joyner v. Whiting, *supra*, 477 F.2d 466, it is not indistinguishable from the government for all purposes. *The Daily Tar Heel* is almost exclusively a student publication. There has been no satisfactory showing that defendants have attempted to regulate the newspaper nor use it to further their own interests. When we speak of the "state"

**1364**

in the context of abridging First Amendment rights, we certainly do not mean to include a campus newspaper which exists primarily for the benefit of, and controlled by, the students themselves. Simply classifying *The Daily Tar Heel* as a state agency for purposes of evaluating its activity in certain circumstances, see Joyner v. Whiting, *supra,* cannot dictate the conclusion that it is, therefore, the organ and creature of the state for all purposes. For instance, when *The Daily Tar Heel* adopts a position on a given subject, it acts more as an independant newspaper than as a state agency. The position is that of its editors and writers and not that of the University or state government. By contrast, if the editors of *The Daily Tar Heel* practiced racial discrimination in hiring staff members, such conduct would constitute state action and would violate the Fourteenth Amendment. Joyner v. Whiting, *supra,* 477 F.2d 466.

■■■ More fundamentally, the notion that it is unconstitutional and somehow violative of the rights of individual members of society for a government to advocate a particular position is erroneous. Judge Butzner stated in Joyner v. Whiting, "[b]oth governments [state and federal] may spend money to publish the positions they take on controversial subjects." Joyner v. Whiting, *supra,* 461. Indeed, *Joyner* upheld the right of a state agency to criticize social integration, notwithstanding the law of the land which precludes that agency from practicing it. What is condemned by the free speech guarantee of the First Amendment is not advocacy by the government, but rather conduct which limits similar rights guaranteed to individual members of society.

This case presents much less than governmental advocacy. Rather, there is simply a governmental subsidy of a forum wherein others may express their views. The Constitution stands guard against use of this subsidy to censor the content. Joyner v. Whiting, *supra.* It does not follow that the Constitution proscribes the subsidy in the first instance.

■■■ Plaintiffs' contention that *The Daily Tar Heel* has advocated particular religious doctrines is factually unsupported by the record. The state can take no action which tends to establish a religious belief, and publicly advocating a particular religious practice or doctrine would have this effect. Joyner v. Whiting, *supra.* As stated earlier in this opinion, it is not at all clear that the actual publication of *The Daily Tar Heel* constitutes state action. Assuming arguendo that this activity does constitute state action, there is simply no basis in fact to support the plaintiffs' contention.

For the reasons heretofore stated, it is concluded that the practice of supporting *The Daily Tar Heel* with funds derived from mandatory student fees and by providing University facilities without charge violates no rights of the plaintiffs guaranteed to them under the First and Fourteenth Amendments to the United States Constitution. Accordingly, defendants may continue to impose and collect the Student Activities Fee and authorize funds derived from this source to be appropriated to *The Daily Tar Heel.* An appropriate judgment and order incorporating these findings will be entered.

However, the Court is constrained to observe that when one considers the magnitude of the operation of *The Daily Tar Heel,* that is, a paid Editor, advertising revenues of approximately $84,-000.00 in 1972–73, a subscriber to United Press International News Service, occupancy of 1125 square feet of office space, with considerable sales of subscriptions off-campus in competition with the local press, there is reasonable cause for the plaintiffs to question why *The Daily Tar Heel* should be subsidized by providing it rent-free space and substantial funds. Obviously, *The Daily Tar Heel's* operation is on a par with the other news media, and its concern goes beyond campus news and gossip or service as a public relations medium for the University. Objective and serious news

coverage will ordinarily bring independence of operation. Some of the advantages of independence, among others, are: (1) efficient operations are essential to survival and thus a better training ground is provided for those interested in news media careers; (2) the paper must gain the support of the public and, therefore, those who control the operation are compelled to be more professional; and (3) by reason of the lack of ties with the University, greater acceptance is enjoyed in that suspicion by subscribers of control is eliminated.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action.

2. This Court, in this District and Division, is the proper venue for this action.

3. The plaintiffs herein, as students in good standing at the University, as payers of all fees levied by the University, have standing to challenge the disbursement of funds derived from mandatory Student Activities Fees ultimately to and for the Benefit of *The Daily Tar Heel* as being in violation of the First and Fourteenth Amendments to the Constitution of the United States.

4. The plaintiffs herein, as taxpayers of North Carolina, have standing to challenge the disbursement of public funds and other University support to and for the benefit of *The Daily Tar Heel* as being in violation of the First and Fourteenth Amendments to the Consitution of the United States.

5. The plaintiffs herein, as students in good standing of the University and as taxpayers of North Carolina, do not have standing to challenge the University subsidy of *The Daily Tar Heel* on the grounds that it creates actual or potential censorship of that publication.

6. The Student Government of the University is an agency of the University and a manifestation of state action, for the purposes of the Fourteenth Amendment to the Constitution of the United States.

7. *The Daily Tar Heel*, when performing functions other than publication, is an agency of the University and a manifestation of state action, and the Editor of *The Daily Tar Heel* is an officer of the University and a manifestation of state action in his capacity as Editor, for the purposes of the Fourteenth Amendment to the Constitution of the United States.

8. The actions of each of the original defendants performed in their official capacity constitutes state action and are, therefore, subject to the limitations imposed by the First and Fourteenth Amendments to the Constitution of the United States.

9. The First Amendment to the Constitution of the United States prohibits any abridgment of the freedom of the press by the government of the United States.

10. The Fourteenth Amendment to the Constitution of the United States extends this prohibition of any abridgment of the freedom of the press to the governments of the several states.

11. A campus newspaper is part of the "press" for the purpose of the First Amendment to the Constitution of the United States.

12. The state may not restrict expression, directly or indirectly, subtly or blatantly, because of its message, its ideas, its contents, or its subject matter.

13. The First Amendment to the Constitution of the United States prohibits any establishment of a religion by the government of the United States. This prohibition has been extended to the governments of the several states by the Fourteenth Amendment to the Constitution of the United States.

14. The occasional reference to subjects of a religious nature in *The Daily Tar Heel* does not constitute the establishment of a religion and is, therefore, not a violation of the First and Fourteenth Amendments to the Constitution of the United States.

15. A state government or any of its agencies is not constitutionally prohibited from expressing views and promoting positions on controversial subjects.

16. A state government or any of its agencies is not constitutionally prohibited from creating or supporting forums whereby diverse views on controversial subjects may be presented.

17. The partial subsidization of *The Daily Tar Heel* through the use of funds derived from mandatory student fees, does not establish an orthodoxy, nor impose upon students who disagree with its contents, views expressed therein.

18. The partial subsidization provided by the University to *The Daily Tar Heel* through funds and free use of physical facilities does not establish an orthodoxy nor impose upon plaintiffs, who disagree with its contents, views expressed therein.

19. The partial subsidization of *The Daily Tar Heel* through the use of funds derived from mandatory student fees and free use of physical facilities does not violate any First Amendment rights of the plaintiffs.